In re Joseph M. BROWN, Jr., Debtor.

**HARDWICK BANK & TRUST COMPANY, Plaintiff,**

v.

Joseph M. BROWN, Jr., Defendant.

**Bankruptcy No. 3–82–01197.
Adv. No. 3–82–0956.**

United States Bankruptcy Court,
E.D. Tennessee.

Aug. 19, 1983.

Baker, Worthington, Crossley, Stansberry & Woolf, Imogene A. King, Knoxville, Tenn., for plaintiff.

Fowler & Rowntree, John A. Walker, Jr., Knoxville, Tenn., for defendant.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

The question before the court concerns the dischargeability of a judgment indebtedness. Plaintiff asserts nondischargeability under 11 U.S.C.A. § 523(a)(2)(B) (1979). Although the debtor concedes his financial statement is materially false, he insists the judgment against him is dischargeable because he did not intend to deceive the plaintiff.[1]

---

1. The debtor's concession that his financial statement is "materially false" is an admission of inaccuracy, as opposed to an admission of intent to deceive. *Collier* recites: "[T]he word "false" [as found in the predecessors of Code § 523(a)(2)] means more than erroneous or untrue and imports an intention to deceive, and a materially false statement in writing must have been knowingly or intentionally untrue to bar a discharge." 3 *Collier on Bankruptcy*, ¶ 523.09[2][a] (15th ed. 1982). Obviously, in the face of his insistence he did not intend to deceive the Bank, the debtor's concession of material falsity does not embrace or import an admission of intent to deceive.

## I

Joseph M. Brown, Jr., the debtor, approached plaintiff Hardwick Bank & Trust Company (the Bank) during the spring of 1980 about financing for an Orange Julius franchise which the Brown-Fritts Corporation expected to open in Dalton, Georgia. In either late April or early May 1980, the debtor visited the Bank's offices in Dalton to discuss the franchise venture. The Bank requested financial statements from both the debtor and George B. Fritts, principals of the Brown-Fritts Corporation.

The debtor's financial statement (Ex. 1), dated March 6, 1980, reflects total assets of $1,194,400.00 and total noncontingent liabilities of $234,000.00, for a net worth of $960,400.00. This financial statement was reviewed with the debtor by Marshall Mauldin, an executive vice-president of the Bank, in either late April or early May, previous to the Bank's loan committee meeting of May 14, 1980. Mauldin asked the debtor a series of questions about the representations in his financial statement. Based on the debtor's responses, Mauldin modified the financial statement to reflect contingent liabilities in the amount of $400,000.00.

The Bank's loan committee essentially authorized Mauldin to exercise his own judgment on the Brown-Fritts application. On or about May 19, 1980, Mauldin mailed to the debtor a commitment letter advising that the Bank would advance an enabling loan of up to $85,000.00. The letter recites in part: "Before these funds are advanced we must receive your deposit of $84,884 ($169,885–$85,000). The funds will be advanced by the Bank as required to pay for leasehold improvements, equipment and fixtures, signs, the cash register, the initial food order, uniforms and miscellaneous deposits." (The projected startup expenses of

$169,885 were subsequently lowered to approximately $130,000.) Mauldin's decision to approve the loan was based on the financial statements of the debtor and George B. Fritts, their investment participation[2] and a favorable recommendation of the debtor by a First Tennessee Bank official (unidentified in the record).

After the debtor received the Bank's commitment letter, Fritts contacted George Harris to offer him an opportunity to participate in the Orange Julius venture. According to Harris, Fritts advised him the corporation needed $50,000 to "make the deal go." Believing the venture would be a good investment, Harris wired $50,000 to the Bank for deposit in the Brown-Fritts-Harris[3] corporate account.

On or about July 18, 1980, the debtor, Fritts, and Harris signed documents personally guaranteeing repayment of the Bank's $85,000 loan to the Brown-Fritts-Harris Corporation. Thereafter, a note and security agreement were duly executed.

On July 21, 1981, subsequent to a monetary default and the unsuccessful attempts to discuss the default with the guarantors, the Bank wrote to its attorney to request his assistance in collection of the loan. Thereafter the collateral securing the Bank's note (equipment and fixtures) was liquidated for approximately $15,000. When further amicable attempts to recover from the guarantors proved unsuccessful, the Bank sought and obtained a judgment in the amount of $76,974.00. This judgment was entered against the debtor, Fritts, and Harris on April 7, 1982.

On August 13, 1982, the debtor filed his voluntary chapter 11 bankruptcy petition. The Bank's complaint requesting a determination of nondischargeability of the unpaid balance[4] of its judgment was filed on October 14, 1982.

---

2. According to Mauldin's deposition testimony of March 4, 1983, the loan application would not have been approved absent the investment participation of the principals of the corporation. See Ex. 7 at 16.

3. The corporate name was changed when Harris became a party to the joint venture.

4. The unpaid balance was $54,474.00, as of January 6, 1983, according to the Bank's amended proof of claim. The original amount of $76,974.00 was reduced by a $22,500.00 payment by Harris, in consideration of his release from any further liability.

## II

Bankruptcy Code § 523(a) provides in apposite part:

A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

.    .    .    .    .

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

.    .    .    .    .

(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's ... financial condition;
(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive;
. . . .

11 U.S.C.A. § 523(a)(2)(B) (1979).

The material dispute between the parties is whether the debtor employed his financial statement with the intent to deceive the Bank.[5]

The debtor's financial statement recites:

I make the following statement of all my assets and liabilities as of the 6th day of March, 1980, and give other material information for the purpose of obtaining credit with you on notes and bills bearing my signature, endorsement, or guarantee, *and agree to notify you promptly of any change affecting my ability to pay.* (Emphasis added.)

Either at, about, or shortly after the time the debtor provided the Bank with his March 6, 1980, financial statement, he effected two transfers affecting his ability to pay his obligations without notifying the Bank. First, on May 7, 1980, the debtor transferred all 500 shares of his Hall-Brown stock, represented in his financial statement to have a value of $250,000.00, in exchange

for a reduction of $50,000.00 in his contingent liability for debts incurred by Hall-Brown. Secondly, on May 9, 1980, the debtor and his wife executed a second deed of trust (Ex. 2) against three separate tracts to secure an indebtedness in the amount of $354,034.59 to the former United American Bank of Knoxville.

The plaintiff Bank maintains these transfers, both occurring previous to its loan committee meeting of May 14, 1980, render the debtor's financial statement materially false. Also, the Bank contends the debtor's failure to notify it of these transfers is evidence of an intent to deceive. In reply, the debtor contends his failure to notify the Bank of the changes was an inadvertent breach of a covenant, at best, which did not cause his previously prepared financial statement to be materially false. Further, the debtor testified he did not realize he had a duty to disclose developments affecting his ability to pay occurring subsequent to the date of his financial statement.

There is also a significant omission in Item No. 5 of the debtor's financial statement, which states:

"No. 5 Real Estate. The legal and equitable title to all the real estate listed in this statement is solely in the name of the undersigned, except as follows: _____
_____."

Six separate tracts having a fair market value of $504,000.00 and encumbered by mortgages or liens in the aggregate amount of $234,000.00 are listed. The sole signature appearing at the bottom of the page is that of Joseph M. Brown, Jr., the debtor. The tenancy by the entirety interest of the debtor's wife in four of the six tracts is not disclosed in the financial statement. These four parcels are represented to have a fair market value of $367,000.00 and to be encumbered by liens in the amount of $169,000.00.

---

**5.** See Note 1, *supra.* Also, the debtor contended that the Bank did not reasonably rely upon his financial statement. However, the proof adduced at trial established partial reliance,

which is sufficient, by the Bank upon the debtor's financial statement. See *In re Magnusson,* 14 B.R. 662, 668 (Bkrtcy.N.D.N.Y.1981).

The debtor concedes the omission of his wife's interest in the four tracts amounts to a materially false representation in his financial statement.[6] However, he insists he did not intend to deceive the Bank through the omission. He testified that he had purchased the four parcels with his own funds; that he thought the real estate belonged to him; that the property was totally controlled by him; and that he did not understand the legal difference between solely-owned property and property owned by the entireties. Mauldin testified that the Bank would have sought the guarantee of the debtor's wife if her interest had been disclosed in the financial statement. More importantly, Mauldin further testified that if he had known about the $354,034.59 second deed of trust to United American Bank, his Bank probably would not have extended the loan.

### III

Code § 523(a)(2) is only slightly modified from § 17a(2) of the former Bankruptcy Act. Unquestionably, the fraud or deceit referred to in § 17a(2) of the Bankruptcy Act meant fraud in fact or positive fraud involving an intentional wrong, as opposed to implied fraud which may be found without any imputation of bad faith. *See Williams v. United States Fidelity & Guar. Co.,* 236 U.S. 549, 35 S.Ct. 289, 59 L.Ed. 713 (1915); *Neal v. Clark,* 95 U.S. 704, 24 L.Ed. 586 (1878).

█ The burden of proof to establish facts entitling it to a finding of nondischargeability is upon the plaintiff. Although a creditor may establish a prima facie case and shift the burden of going forward with evidence refuting the averred intent to deceive, the burden of persuasion remains upon the creditor. Absent a fiducial relationship, fraud must be proven by "clear and cogent" evidence. *Groves v. Witherspoon,* 379 F.Supp. 52 (E.D.Tenn. 1974). Furthermore, fraud is never presumed; it must be proven. *Snapp v. Moore,* 2 Tenn. (2 Overt.) 236 (1814). Nonetheless, the court concurs in the observa-

tions of Judge Paskay with respect to proving intent to deceive:

> One cannot x-ray the mental processes of a debtor and direct proof of intent to deceive is well-nigh impossible. However, it is not necessary to furnish direct proof and the fraudulent intent may be inferred from the surrounding circumstances. Thus, it is sufficient to show that a false representation on a financial statement was made with actual knowledge that it was incorrect or it was made with reckless indifference and disregard of the actual facts and without examining the available sources which were readily available and the statement was made without reasonable grounds to believe that the statement was, in fact, correct. *Morimura, Arai & Co. v. Taback,* 279 U.S. 24, 33, 49 S.Ct. 212, 215, 73 L.Ed. 586 (1929).

*Matter of Rickey,* 8 B.R. 860, 863 (Bkrtcy.M.D.Fla.1981).

█ The court is persuaded that the Bank has met its burden of proof in this case. Although the debtor testified he had no intent to deceive the Bank, an unsupported assertion of an honest intent may not overcome natural inferences from admitted facts. 1A *Collier on Bankruptcy,* ¶ 14.40 (14th ed. 1973); *In re Aldrich,* 16 B.R. 825, 829 (Bkrtcy.W.D.Ky.1982). The debtor's financial statement admittedly omits any disclosure of his wife's joint interest in four of the six tracts in which the debtor has an ownership interest. Instead of a solely-owned net equity of approximately $200,000.00, the debtor's interest in the four tracts is limited to that of a tenant by the entirety, owning only a hope of survivorship. More importantly, the debtor failed to advise the Bank of two very substantial transfers, occurring after the preparation of his financial statement but prior to the Bank's loan commitment letter, irrefragably reducing his net worth and affecting his ability to pay.

The debtor is a college graduate with a degree in economics. He is experienced in

---

**6.** See note 1, *supra.*

obtaining commercial financing and had submitted financial statements to lending institutions on previous occasions. He was president of both Hall-Brown Corporation and Bowen's Jewelry of Knoxville when he submitted the financial statement in question to the Bank.

Accepting *arguendo* the debtor's explanation for his failure to disclose his wife's interest in their jointly-owned real property, the fact remains that the debtor failed to inform the Bank of the transfer of his Hall-Brown stock and the execution of a second deed of trust securing an indebtedness of $354,034.59. Each of these transfers, apparently effected within one to two weeks before the submission of the debtor's financial statement to the Bank, occurred while the Bank was contemplating the corporate loan application. The representations in his financial statement were "continuing" in character, and the debtor had a duty to advise the Bank of any significant change in his financial condition. *See In re Hollock,* 1 B.R. 212 (M.D.Pa.1979). His failure to inform the Bank of the substantial change in his financial condition between the date of his financial statement (March 6, 1980) and the date of the Bank's commitment letter (May 19, 1980) amounts to a reckless indifference to the Bank's rights tantamount to a willful misrepresentation. Consequently, the debtor's failure to advise the Bank of the change in his financial condition warrants a finding that the debtor intended to deceive the Bank.[7]

This Memorandum constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

---

7. Although the debtor may not have intended to deceive the Bank when his financial statement was executed, as previously noted, the statement is a continuous representation of his financial condition. His failure to inform the Bank of the change in his financial condition is evidence that an intent to deceive the Bank was formed previous to the Bank's decision on the corporate loan application and the receipt of the loan proceeds.