In re Samuel Darryl HARMS a/k/a Samuel Darryl Harms, Jr. and Judith Heilig Harms, a/k/a Judith Ann Heileg, Judith Heiling Harms, individually and d/b/a Harms Irrigation, Heartland Tank Co., Heartland Tank, Hearthland Tank, Harms Farms, Sam Harm Irrigation, Sam Harms Irrigation, Debtors.

IFG LEASING COMPANY, Plaintiff,

v.

Sylvia I. VAVRA, Samuel Harms and Judith Harms, Defendants.

Bankruptcy No. 5–81–356.
Adv. No. 5–82–13.

United States Bankruptcy Court,
D. Minnesota,
Fifth Division.

March 6, 1985.

Kenneth G. Schivone, St. Paul, Minn., for plaintiff.

Robert L. Kalenda, St. Cloud, Minn., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

The above-captioned matter came on before the undersigned United States Bankruptcy Judge on November 7 and 8, 1984, for trial. Plaintiff appeared by its attorney, Kenneth G. Schivone. Defendants Samuel Darryl Harms, Jr. and Judith Heilig Harms appeared personally and by their attorney, Robert L. Kalenda. Upon the evidence adduced at trial, and upon all of the other files, records, and proceedings herein, the Court makes the following as its Findings of Fact, Conclusions of Law, and Order for Judgment.

### FINDINGS OF FACT

Defendants-Debtors Samuel Darryl Harms, Jr. and Judith Heilig Harms filed their Petition under Chapter 7 of the Bankruptcy Code in this Court on November 19, 1981. Included among their scheduled unsecured debts was one to Plaintiff IFG Leasing Company (hereinafter "IFG") in the scheduled amount of $211,259.00. This debt is the subject of these adversary proceedings for determination of dischargeability; IFG claims that it was incurred on the basis of a false financial statement, in violation of 11 U.S.C. § 523(a)(2)(B).[1] It appears that both Samuel Darryl Harms and Judith Heilig Harms executed all documents relating to the transactions between IFG and them, but that Mr. Harms was the only one of the two Debtors to participate in the application and negotiation process with IFG. Therefore, all references in this opinion to "Debtor" shall be references to Mr. Harms as an individual, and all references to "Debtors" shall be to both Mr. and Ms. Harms.

In 1977 and 1978, Debtor engaged in a variety of agriculture-related business activities in the St. Cloud, Minnesota area, including farming operations, irrigation, and the purchase and re-sale of bulk storage tanks. Debtor targeted some of his grain crop production toward the market for distillation into alcohol, for ultimate use in "gasahol". To expand his farming operations, Debtor decided to purchase additional farmland and equipment and actively sought financing for these purchases. In the late summer or early fall of 1978, Debtor prepared a personal financial statement for use in applications for credit. This financial statement set forth the values, as of October 1, 1978, for parcels of real estate which Debtor had acquired over the preceding nine years; it also listed the balance due on encumbrances against each

1. IFG dismissed its claims against Defendant Sylvia I. Vavra by Stipulation.

parcel. In this proceeding, IFG challenges the values assigned to real estate parcels which shall be referred to as "the Becker farm", "the Frerich farm", "the Rice farm", "the Sufka farm", and "the 55-acre river parcel". Debtor had acquired all of these parcels over the preceding nine years. He had acquired the 55-acre river parcel as part of a 60-acre parcel purchased in May, 1975, from which he split off a 2½-acre lot for his homestead and a 2½-acre parcel for later sale as a residential lot.

As support for the values assigned to the Becker, Frerich, and Rice farms, and the 55-acre river parcel, Debtor used four letters from Calhoun Realty area representative Michael J. Schmitt. (Debtor had entered into a purchase agreement for the Sufka farm before he first prepared the financial statement but had not closed on the sale as of April 26, 1978.) These letters set forth Mr. Schmitt's opinion of the estimated market values of these parcels as of April 26, 1978, "for the purpose of a possible sale". Mr. Schmitt is a licensed real estate broker. As of April, 1978, he had had seven years of full-time work experience as a real estate salesman and broker in the St. Cloud, Minnesota area, and had primarily handled commercial real estate transactions. He was not licensed or certified as a real estate appraiser and had taken no formal course work in real estate appraisal. In reaching his opinions of the market value of the four parcels in dispute in this proceeding, Mr. Schmitt did a cursory physical inspection of each parcel, tried to find similar parcels of land in the area which had been sold in the recent past, and determined the prices which these similar parcels of land were obtaining in actual sales from other brokers and agents in the area. In rendering his opinion, he was trying to determine a "fair asking price", which in his opinion was "not necessarily different from the sale price" which would be obtained in an arms-length sale transaction. Mr. Schmitt based his opinion of the 1978 value of the 55-acre river parcel on his prediction that the property would be subdivided and sold as residential lots. He concluded that such development was inevitable because of the attractive location of the property and the strong market in riverfront residential property then obtaining in the St. Cloud, Minnesota area. However, he did not consider the effect of county zoning ordinances on the possible developmental uses of the property; specifically, he did not determine whether the county flood plain zoning ordinance would prohibit intensive residential subdivision of the sort assumed by him in his determination of value.

Debtor submitted his financial statement to several prospective lenders, as part of applications for credit. All of these prospective lenders apparently relied on the financial statement and one, Aetna Life Insurance Company (hereinafter "Aetna"), made a loan to Debtor in the amount of $100,000.00, which was secured by a junior mortgage on several of Debtor's parcels of real estate. Debtor's loan application with Aetna was pending when he applied for financing from IFG, as was an application for equipment leasing from Dial Leasing Company. The Dial application was for a lease with a total of payments of approximately $180,000.00.

In 1978, IFG was in the business of leasing agricultural equipment to farmers and farm-related businesses, as a form of extension of credit. As a part of his planned expansion, Debtor hoped to obtain grain handling equipment and a grain storage tank and to build a commercial office building on one of his parcels of land. Debtor first learned of IFG's leasing program through a salesman at a trade show and made the first contact with IFG by making an appointment with Warren Jeffers, then credit manager in IFG's Minneapolis office. Debtor applied for credit through IFG and dealt with Mr. Jeffers and Paul Thulin, then IFG's Minneapolis office manager. In support of his application for credit Debtor submitted his financial statement, his personal income tax returns for several previous years, and credit references from lenders and trade suppliers. IFG also ordered a Dun & Bradstreet report on Mr. Harms' business operations,

**138**

which Mr. Jeffers received prior to the final decision on Mr. Harms' credit-worthiness. During the course of conversations between Debtor and Mr. Thulin, they discussed Debtor's pending application for mortgage financing with Aetna. Debtor had not listed this application on his financial statement; nor, at any time or in any form, did he reveal his pending application with Dial Leasing Company.

After IFG obtained the Dun & Bradstreet report and credit report, Mr. Jeffers evaluated Debtor's application. Mr. Jeffers deemed Debtor an "appropriate risk" based on the three major factors which IFG considered in all credit applications: first, a "very good credit history" from a credit report and positive references from bankers and trade suppliers; second, a positive and sufficiently high cash flow from his agricultural and business activities; and third, an adequate net worth, based upon the value of his real and personal property less encumbrances and personal liabilities. Mr. Jeffers did not place these three major factors in any order of priority and Debtor's net worth as revealed on his financial statement was a "significant consideration" in Mr. Jeffers' determination. In so concluding, Mr. Jeffers relied upon Debtor's proven cash flow and credit history as the primary assurance of payment. In any event, Mr. Jeffers relied upon Debtor's net worth as a secondary source of payment in the event of default and subsequent liquidation.

At trial, Mr. Jeffers testified that he "netted" the real estate values given in Debtor's financial statement with the total of then-present encumbrances and the proposed Aetna mortgage, concluding that Debtor had sufficient real estate equity to provide IFG with recourse in the event of default. He testified that, had the values revealed by IFG's later appraisals been known to him, and had the potential liability on the Dial equipment lease been revealed, the "netting" process would have revealed that Debtor had little or no real estate equity. In such case, IFG would not have extended credit to Debtors. Mr. Jeffers further testified that, even had the

netting process revealed as much as $200,000.00 in real estate equity, IFG would have concluded it did not have adequate recourse, and would not have extended credit under the form of the lease as it was actually drafted. This evidence indicates the weight given to net worth in IFG's credit analysis; it plainly made its decision on the basis of the very substantial real estate equity alleged in Debtor's financial statement.

At no time did any IFG employee obtain an independent appraisal of any of Debtor's real estate, and at no time did any IFG employee question Debtor about the values assigned to Debtor's real estate in his financial statement. However, the Dun & Bradstreet report obtained by IFG scheduled a total value for all of Debtor's non-homestead real estate (including the five parcels in question in this proceeding *and* several other parcels) of $604,600.00. At trial, Mr. Jeffers testified that he ordered a Dun & Bradstreet report in credit evaluations "as a matter of course", that he felt that it was of secondary importance, and that he generally ignored the valuations of an applicant's property in a Dun & Bradstreet report where an applicant had prepared his own financial statement.

Mr. Jeffers prepared a lease proposal for the complex of grain handling and storage equipment and the commercial building and submitted it to IFG's main office in Great Falls, Montana. Personnel at IFG's main office approved the proposal for the grain complex and rejected the proposal for the commercial building. IFG and Debtors executed a "Master Lease Agreement" for the grain complex on November 15, 1978, which provided for periodic rent payments.

Due, apparently, to the sudden drop in demand for "gasahol", and a coincident drop in grain prices, Debtors suffered severe financial reverses during 1979 and 1980. They went into default on the IFG lease. On January 26, 1981, IFG accelerated Debtors' obligations under the terms of the lease and demanded the return of the leased equipment. Pursuant to the

lease terms, the parties then placed their dispute into arbitration. Eventually, an arbitration award in the amount of $152,302.59 was made to IFG. IFG subsequently sold the leased equipment for $25,000.00. As of the date of trial, IFG was carrying "receivable balances" on Debtors' leases in the total amount of $104,124.02.

After the filing of Debtors' Petition in this Court, IFG hired Kenneth Panger and the Miller Real Estate Agency of St. Cloud, Minnesota, to appraise the four parcels on which Mr. Schmitt had rendered opinions of value. Following standard practice in the real estate appraisal profession, Mr. Panger performed extensive on-site inspections of each parcel during the summer of 1982. At that time, Mr. Panger had not yet been certified by the National Association of Independent Fee Appraisers; he was a licensed real estate agent and was working under the direct supervision of Maury Johnson, a senior appraiser of 14 years' appraising experience also employed by Miller Real Estate Agency. After each inspection, Mr. Panger reviewed as many as 200 Certificates of Real Estate Value filed in the Becker County Assessor's office during 1978, from which he selected ten to twelve properties of comparable size, terrain, zoning, and past use to determine the sale prices obtained for comparable properties in the St. Cloud, Minnesota area during the summer and fall of 1978. This process is accepted in the appraisal profession as a means of obtaining a fair market valuation for real estate at a point in the past; it is used in probate proceedings for valuation and taxation purposes. Following standard appraisal procedure, Mr. Panger determined the highest and best use for each parcel by looking up the present zoning classification for each parcel. He found that a portion of the 55-acre river parcel was subject to the Becker County flood plain zoning plan, which prevented extensive development of much of the parcel. In his written appraisals for all four parcels, Mr. Panger determined the "fair market value" of each parcel, as the term is defined in accordance with standards in the appraisal profession.

The parties' evidence on values of the real estate and Debtor's "net real estate worth" can be summarized as follows:

| LOCATION | PURCHASE PRICE (DATE OF PURCHASE) | DEBTOR'S FINANCIAL STATEMENT | | IFG'S APPRAISAL VALUE |
| --- | --- | --- | --- | --- |
| | | VALUE | BALANCE DUE | |
| Becker farm | Unknown (1969–70) | $279,000.00 | $118,200.00 | $260,000.00 |
| Frerich farm | $70,000.00 (Spring 1978) | $103,000.00 | $65,000.00 | $64,500.00 |
| Rice farm | $35,500.00 (1976) | $160,000.00 | $24,000.00 | $96,500.00 |
| Sufka farm | $100,000.00 (1978) | $153,600.00 | $80,000.00 | Appraisal not done |
| 55-acre river parcel | $64,000.00 (May 1975) | $485,000.00 | $39,000.00 | 42,500.00 |
| Industrial zoned parcels | Unknown | $45,000.00 | $9,000.00 (against one parcel) | Appraisal not done |
| Homestead | See 55-acre parcel | $61,000.00 | $0.00 | Appraisal not done |
| Wooded river lot | See 55-acre parcel | $18,000.00 | $0.00 | Appraisal not done |
| | | $1,304,900.00 | $335,200.00 | |

## CONCLUSIONS OF LAW

The law applicable to this adversary proceeding is 11 U.S.C. § 523(a)(2)(B), which provides in pertinent part as follows:

... A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) For money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) Use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; ...

■ The burden of proving the four elements set forth under § 523(a)(2)(B) is entirely on the party seeking to have a debt found nondischargeable. *In Re Klein*, 20 B.R. 119, 121 (Bankr.E.D.Pa.1982). All elements must be proven by clear and convincing evidence, a burden of proof more stringent than the standard burden in civil cases of a preponderance of the evidence. *In Re Tomeo*, 1 B.R. 673, 677 (Bankr.E.D.Pa. 1979); *In Re Smith*, 2 B.R. 276, 278 (Bankr.E.D.Va.1980); *In Re Pommerer*, 10 B.R. 935, 938 (Bankr.D.Minn.1981); *In Re Keppel*, 14 B.R. 479, 481 (Bankr.E.D.Pa. 1981); *In Re Magnusson*, 14 B.R. 662, 667 (Bankr.N.D.N.Y.1981); *In Re Isaacs*, 15 B.R. 210 (Bankr.S.D.Ohio 1981); *In Re Russell*, 18 B.R. 325 (Bankr.E.D.Pa.1982); *In Re Lowinger*, 19 B.R. 853, 855 (Bankr.S. D.Fla.1982); *In Re Ardelean*, 28 B.R. 299, 301 (Bankr.N.D.Ill.1983); *In Re Mann*, 40 B.R. 496, 498–99 (Bankr.D.Mass.1984).

■ The Courts have construed the meaning of the statutory provisions setting forth the four elements. First, it has been noted that a "materially false" statement is one "which paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *In Re Denenberg*, 37 B.R. 267, 271 (Bankr.D.Mass.1983). *See also In Re Tomeo, supra,* at 676. A written financial statement setting forth a debtor's assets, liabilities, and net worth is by its very nature a written statement which "re-

spect[s] the debtor's ... financial condition".

■ The creditor must show that it both actually and reasonably relied upon the financial statement in extending credit to the debtor. *In Re Andrews*, 33 B.R. 970, 972 (Bankr.D.Mass.1983); *In Re Denenberg, supra,* at 271. Thus, the creditor's conduct is measured not only against a subjective standard of whether it actually relied upon the false statement, but against an objective standard of reasonableness.[2] So far, the Courts have recognized four classes of cases where a creditor's reliance on a false financial statement is unreasonable:

1. Where the creditor knows at the outset that the financial statement is not accurate. *In Re Houk*, 17 B.R. 192 (Bankr.D.S.D.1982); *In Re Klein*, 20 B.R. 119 (Bankr.E.D.Pa.1982); *In Re Futterman*, 35 B.R. 102 (Bankr.D.Conn. 1983); *In Re Byrd*, 41 B.R. 555 (Bankr.E. D.Tenn.1984).

2. Where the financial statement does not contain sufficient information to present an accurate portrait of the debtor's financial condition for credit analysis. *In Re Isaacs, supra; In Re Magnusson, supra; In Re Andrews*, 33 B.R. 970 (Bankr.D.Mass.1983); *In Re Saunders*, 37 B.R. 766 (Bankr.N.D.Ohio 1984).

3. Where the creditor's own investigation reveals the likelihood that the debtor's financial statement is false or incomplete. *In Re Smith*, 2 B.R. 276 (Bankr. E.D.Va.1980); *In Re Keppel*, 14 B.R. 479 (Bankr.E.D.Pa.1981); *In Re Barrup*, 37 B.R. 697 (Bankr.D.Vt.1983).

4. Where the creditor fails to independently verify any of the information contained on the financial statement. *In Re*

---

**2.** Congress added the word "reasonably" to the prior language contained in § 17a(2) of the Bankruptcy Act, when it enacted § 523(a)(2)(B) as a part of the Bankruptcy Code in 1978. It did so to make the requirement of reasonableness in the creditor's reliance explicit, though the legislative history indicates that this language was inserted only in recognition of a developing

trend in the case law to judicially impose the requirement upon the language of § 17a(2) of the Act. 3 COLLIER ON BANKRUPTCY ¶ 523.-09[4] at 523–59 (15th ed. 1984); S.REP. No. 989, 95th Cong., 2d Sess. 78 (1978); H.R.REP., No. 595, 95th Cong., 1st Sess. 130–31, 364 (1977); *In Re Patch*, 24 B.R. 563, 565 (D.Md.1982); *In Re Duncan*, 35 B.R. 323, 324 (Bankr.W.D.Ky.1983).

*Breen,* 13 B.R. 965 (Bankr.S.D.Ohio 1981).[3]

*See, generally, In Re Patch, supra,* at 566; *In Re Ardelean, supra,* at 301; *In Re Duncan, supra,* at 325. The emerging standard of reasonableness requires the Court to measure the creditor's actual conduct in the case at bar against three different factors: the creditor's standard practices in evaluating credit-worthiness; the standards or customs of the creditor's industry in evaluating credit-worthiness; and the surrounding circumstances existing at the time of the debtor's application for credit. *In Re Patch, supra,* at 567; *In Re Ardelean, supra,* at 301. *Compare, In Re Garman,* 643 F.2d 1252 (7th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981); *In Re Blatz,* 37 B.R. 401 (Bankr.E.D.Wis.1984).

Of course, proof of a debtor's subjective intent to deceive is difficult. In the absence of the rare actual statement of intent, the Court is left with a pattern of circumstantial evidence. *In Re Brown,* 32 B.R. 554, 557 (Bankr.E.D.Tenn.1983). Some Courts have held that proof of the first three elements of a false financial statement under § 523(a)(2)(B) creates a presumption that the debtor made the statement with intent to deceive. Under this approach, once the plaintiff makes a prima facie case of the first three elements, the burden of production shifts to the debtor. If the debtor does not produce evidence of a lack of intent, the plaintiff may rely upon the presumption. If the debtor produces evidence of lack of intent, the presumption is rebutted and, under operation of FED.R.EVID. 301, it "disappears".

*In Re Tomeo, supra,* at 677; *In Re Magnusson, supra,* at 669.

■ Other Courts have relied upon a somewhat less formulaic test, and have held that the Court *may* infer fraudulent intent "where the debtor knew or should have known of the falsity of his statement". *In Re Denenberg, supra,* at 271; *In Re Mann,* 40 B.R. 496, 500 (Bankr.D. Mass.1984). Some Courts have allowed this inference to be made where a debtor made a false financial statement with actual knowledge of its truth or falsity, with reckless indifference to its falsity, or after disregarding actual facts suggesting its falsity. *In Re Brown, supra; In Re Byrd, supra,* at 563. This Court concludes that reliance on a presumption in a dischargeability action is a suspect practice where the presumption is not legislatively created, given the mandate to narrowly construe exceptions to discharge and the legislative goal of broadly affording the debtor his "fresh start". *Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *In Re Brown, supra,* at 557. Therefore, it will adopt the test allowing it but not requiring it to make an inference of fraudulent intent, once the plaintiff has shown the first three elements and has produced some proof of actual knowledge of falsity or reckless disregard for the truth.[4]

In the case at bar, IFG argues that Debtor's debt to it must be found nondischargeable on the ground that it was obtained by use of a false financial statement. Specifically, IFG argues that Debtor's financial statement was materially false in grossly overstating the market value of the Becker, Frerich, Sufka, and Rice farms, and, particularly, the 55-acre river parcel. IFG

---

**3.** This approach would appear to impose the duty of independent verification of entries on a financial statement on the creditor regardless of whether the creditor had cause to suspect them false or not. The Court has reservations whether the Bankruptcy Code can be construed to impose such a burden where individual or industry practice do not already require it. The facts of this case do not require the Court to decide whether this is an appropriate approach, and this notation is not to be taken as an endorsement or adoption of it.

**4.** Practically speaking, choice of the approach recognizing a presumption of fraudulent intent would probably not result in a change in the nature of evidence elicited by parties in dischargeability actions. Few informed creditor's attorneys would rely upon the presumption and forebear from presenting any evidence on intent, just as few informed debtor's attorneys would rely upon the Court not to infer intent under the standard adopted by the Court, and fail to present evidence of lack of intent.

further argues that Debtor fraudulently failed to reveal the pendency of his application for mortgage financing from Aetna, and the pendency of his leasing arrangement with Dial Leasing, both of which reduced his net worth under IFG's credit analysis. IFG argues that it reasonably relied upon Debtor's financial statement and that Debtor knowingly and fraudulently used the financial statement to obtain credit from IFG which IFG would not have granted had the financial statement been accurate.

Preliminarily, there is no question that the financial relationship between the parties was an extension of credit, even though nominally cast as a lease. In addition, there is no question that Debtor's financial statement was a statement in writing, respecting his financial condition.

The Court concludes that IFG has met its burden of proof on all but one of the elements of § 523(a)(2)(B). Debtor's financial statement was "materially false" in two respects. First, it is clear that the values of the Frerich, Rice and Sufka farms were overstated, and, in the case of the 55-acre river parcel, the value was grossly overstated.[5] IFG's appraisals and Mr. Panger's opinion must be accorded far more credibility than Mr. Schmitt's opinion. Mr. Panger came to his conclusions on value after exhaustive study of the parcels in question and after a thorough comparison of them against actual market prices obtained in comparable recent sales. Mr. Schmitt, on the other hand, made a relatively cursory inspection and investigation of the parcels. While he attempted to use "comparables", he did not make a comprehensive search for them; rather he relied upon word-of-mouth information from fellow brokers. While Mr. Schmitt sought to determine a contemporary market price for the parcels, he did so in a much more impressionistic fashion than Mr. Panger. He failed to consider the crucial impact of zoning on the possible developmental uses for the river

parcel; he also may have based his estimate of contemporary value on certain contingencies such as platting and completed site preparation which had not yet occurred. The fact that Mr. Panger did his appraisals several years after the relevant date does not affect the credibility of his conclusions, as they were reached using procedures commonly used and relied upon in legal proceedings. Plainly, Debtor's financial statement presented a "substantially untruthful picture" of the 1978 value of these parcels. Second, Debtor's financial statement was also materially false in its failure to schedule or mention the pending financing arrangements with Aetna and Dial Leasing. Both property values and existing encumbrances and liabilities were factors which would have affected IFG's determination of credit-worthiness.

The question of Debtor's fraudulent intent is closer and more problematic. IFG asks the Court to infer fraudulent intent from all of the facts and circumstances. At no point during direct or cross-examination did Debtor make any statement directly indicating he intended to deceive IFG as to his net worth. However, the Court concludes that, at the very least, Debtor submitted his financial statement to IFG in reckless indifference of the truth or falsity of the values of the Frerich, Rice, and Sufka farms and the 55-acre river parcel. This inference is suggested by the fact that the financial statement valued the Frerich farm at a level approximately 50% above the price for which Debtor acquired it no more than six months prior to the date of the financial statement, and the Sufka farm at a level approximately 50% above the price Debtor had agreed to pay for it. It is more strongly suggested by the fact that it valued the Rice farm at a level more than four times what Debtor paid for it approximately two years earlier, though there was some suggestion at trial that this farm had actually appreciated in value by some unknown percentage from 1976 to 1978 due to the maturing of a Christmas

5. Mr. Panger testified on cross-examination that the disparity in value assigned to the Becker farm between his and Mr. Schmitt's appraisals was within an acceptable range of disparity under standard appraisal principles.

tree crop, the installation of irrigation systems, and a rapid appreciation in land values during those two years. It is virtually *compelled* by the fact that it valued the 55-acre river frontage at more than seven times what Debtor paid for the full sixty-acre river parcel only two years prior to the date of the financial statement. This inference may be made where there is such a disparity between actual and stated values that the debtor's espousal of the stated values is "far-fetched". *In Re Denenberg, supra,* at 271. If anything, the actual purchase price of the 55-acre parcel was something less than the sum of $64,000.00, as Debtor had split off five undeveloped acres from the full 60-acre parcel for his homestead and a separate residential lot. Debtor presented no evidence of any sort to show that he had made substantial improvements such as road, sewers, or utilities, which would justify a seven-fold increase in value; the evidence presented to attribute the increase in value to an active real estate market was vague and imprecise and simply does not justify a conclusion that Debtor was reasonable in concluding that the river parcel was worth $485,000.00 in 1978. Debtor's testimony on the basis for his belief in the "fairness" of Mr. Schmitt's opinions was conclusory and unconvincing at best.

Debtor's testimony as to why he omitted mention of the Dial Leasing application was similarly unconvincing. This credit application was made immediately prior to his application for credit from IFG and were certainly material. Debtor was a businessman of some experience and knew or should have known that this additional liability, potential or actual, was material to IFG's determination of credit-worthiness.

■ This leaves the element of reliance. IFG actually relied on Debtor's financial statement and its statement of net worth in deciding to extend credit to him. The fact that IFG made its decision primarily on the basis of factors derived from other parts of Debtor's application does not mean it did not actually rely on the stated values for the real estate. Partial reliance on a false financial statement is sufficient to show actual reliance, so long as the financial statement is a substantial part of the collective financial information relied upon. *In Re Rodriguez,* 29 B.R. 537 (Bankr.E.D. N.Y.1983). Mr. Jeffers testified that IFG's credit evaluation process looked to net worth as a secondary source of payment and that he relied upon Debtor's statement of net worth in concluding that IFG would have some protection in the event of default. This partial reliance on the real estate valuations set out in Debtor's financial statement is sufficient to show actual reliance. The fact that IFG also used documents other than the financial statement does not change this conclusion; nor does the fact that it made its decision by deciding Debtor was a good risk based on cash flow and credit history as well as net worth.

■ However, IFG has not met its burden to prove that it *reasonably* relied upon Debtor's financial statement. This conclusion is compelled by the fact that the credit investigation conducted after submission of the financial statement unequivocally revealed the likelihood that the values assigned to Debtor's real estate were false. Debtor's former loan officer testified that the Dun & Bradstreet report on Debtor's business operations revealed a total value for *all* of Debtor's non-homestead real estate of slightly over $600,000.00. The record does not indicate where Dun & Bradstreet obtained this information. However, there is no question that the Dun & Bradstreet report valued Debtor's non-homestead real estate at less than 50% of the value assigned to it on Debtor's own financial statement. IFG's loan officer testified that he did not pay much attention to the property valuations in a Dun & Bradstreet report and, apparently, did not pay much attention to the report at all. The record is devoid of evidence as to whether it was IFG's corporate policy to ignore

such information, or even whether it was standard trade practice to do so, when an applicant presented his own values. Regardless, the Court is compelled to conclude that the mere existence of the entry on the Dun & Bradstreet report was, in light of all of the circumstances, a proverbial "red flag" which placed IFG on notice that Debtor's financial statement might be false. Such reports are respected and universally relied upon in credit determinations; while certainly not infallible, they are given great weight. Having ignored available information that should have led it to protect itself by making further inquiry, IFG cannot be heard now to say that it reasonably relied upon Debtor's financial statement. *In Re Smith, supra*, at 279. As an early commentator on § 523(a)(2)(B) noted,

> A creditor who ignores available information or who fails to seek information from sources that are commonly used, should not be heard to complain about the debtor's fraud. It is the creditor's failing to comport with normal business practices, not the debtor's fraud, that is the true cause of the loss.

Zaretsky, *The Fraud Exception to Discharge Under the New Bankruptcy Code*, 53 AM.BANKR.L.J. 253, 262 (1979).

Because IFG has failed to prove all of the elements of § 523(a)(2)(B) by clear and convincing evidence, it logically follows that the Court cannot find that Debtor's debt to IFG was not excepted from Debtor's discharge in bankruptcy.

### ORDER FOR JUDGMENT

Based upon the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Debtors' debt to IFG Leasing Company was not excepted from the discharge in bankruptcy granted to Debtors by this Court's Order of March 23, 1982.

LET JUDGMENT BE ENTERED ACCORDINGLY.