**In re Huxley P. KONOPKA aka Phillip P. Konopka and Peggy J. Konopka, Debtors.**

**OMNIBANK AURORA, N.A., Plaintiff,**

**v.**

**Huxley P. KONOPKA aka Phillip P. Konopka and Peggy J. Konopka, Defendants.**

**Bankruptcy No. 85 B 3694 M. Adversary No. 85 G 627.**

United States Bankruptcy Court, D. Colorado.

May 29, 1986.

Timothy C. Ford, Aronowitz, Helgeson & Pearson, P.C., Arvada, Colo., for Omnibank Aurora, N.A.

Steven W. Hickox, Denver, Colo., for Huxley P. and Peggy J. Konopka.

## MEMORANDUM OPINION AND ORDER

CHARLES E. MATHESON, Bankruptcy Judge.

This adversary proceeding was commenced by OmniBank Aurora (hereinafter referred to as "the Bank") against the

Debtors on the complaint of the Bank seeking a determination that the Debtors' obligations to the Bank are nondischargeable.

The evidence at the hearing disclosed that in February 1985, the Debtor, Huxley P. Konopka, applied at the Bank for a guaranteed check card. At that time he and Mrs. Konopka filled out a financial statement and submitted it to the Bank in support of their application.

The financial statement provided to the Bank in February 1985 represented that Mr. Konopka had a gross monthly income of $5,000 in addition to which Mrs. Konopka had a monthly income of $1,750. They also received $550 in rental income from a rental property. The schedules which are a part of the financial statement listed the real property in which the Debtors had an interest and disclosed the outstanding mortgages against the real estate. The unsecured debts listed in the financial statements totalled $19,800.00. The financial statement was signed by both of the Debtors, and the form contained the following statement immediately above the signatures.

> I hereby represent and warrant that the information set forth above and on the reverse side hereof, is true, correct, complete and accurate in all respects, and it is a full and complete disclosure of my financial condition as of the date hereof. This statement is made for the purpose of inducing the Bank to loan money from time to time, secured and unsecured, to me or to accept my endorsement or guarantee of the obligations of others. The Bank is authorized to make such investigation of the representations herein as the Bank deems desirable. This application is the property of the Bank for all purposes. I further agree to notify the Bank if there is any material change in my financial condition subsequent to the date hereof and during the time when I may be indebted to the Bank.

The 1984 federal tax return of the Debtors reported total gross income of $13,676 for Mrs. Konopka and $27,860 for Mr. Konopka. In 1985 Mr. Konopka, who worked as a real estate salesman, had gross commissions of $30,440. The statement of unsecured debt was deficient in that the actual unsecured indebtedness outstanding was in excess of $34,000. In addition, Mr. Konopka did not disclose that no payments had been made on the first mortgage on his home since September of 1984 and foreclosure was being threatened.

In addition to filling out the financial statement the Debtors entered into a check guarantee agreement. Under the terms of that agreement the Bank, upon issuance of the check guarantee card, was bound to honor any check of $100 or less which was drawn by either Mr. or Mrs. Konopka. The Debtors agreed to maintain a balance in their checking account sufficient to pay all checks or to have credit available in their Bank cash cushion account sufficient to cover the checks. The cash cushion account was under a separate agreement and was essentially the loan agreement pursuant to which the Bank agreed to make advances, up to a total of $100, to the Debtors' checking account to cover checks drawn under the check guarantee card. That agreement expressly provided that each of the Debtors "shall be jointly and severably liable for the payment of all obligations under such account." Both Debtors signed the cash cushion agreement. In May, at the request of Mr. Konopka, the Bank extended the credit available under the cushion agreement to $500.00.

Mr. Konopka encountered delays in closings of real estate that he had listed which resulted in delays to him of income. In early June of 1985, for reasons not fully explained, Mr. Konopka cashed a series of twenty-one (21) checks each in the amount of $100. All of the checks were drawn either on Safeway or on King Soopers. In doing so he drew from one to five checks in any given day. At the time that the checks were drawn Mr. Konopka did not have the funds available in his account, nor credit available under his cash cushion agreement, to cover the checks. Mr. Konopka testified that at the time he drew the checks he was aware that he did not have

the funds to cover them, but expected a series of closings to occur in the near future which would have given him sufficient cash to pay all of the outstanding checks. He also testified that it was his belief that it would be Safeway and King Soopers which would be caught holding the bag on the checks and not the Bank, indicating that it was never his intent that the Bank would end up with the short checks. His testimony in that regard is directly contrary to the terms of the Bank agreements he had signed. His plea of ignorance of the terms of the Bank agreements is either not credible, or is evidence of his gross disregard of his financial affairs, particularly in light of the fact that he had previously had an Omnibank check guarantee card which he had used in the past.

When the checks began to appear at the Bank, Mr. Konopka was called by the Bank and requested to surrender his check guarantee card, which he did. He told the Bank that he did not have funds available to pay the shortages but believed that he would have the funds within 30 days by reason of real estate closings which were set. The Bank was then in a position of having an overdrawn checking account in the amount of $2,295.74, which the Bank was anxious to clear. They requested that Mr. Konopka prepare a new financial statement, and told Mr. Konopka the Bank would consider a 30–day loan to clear the overdraft.

Mr. Konopka prepared a new financial statement dated June 14, 1985, which was unsigned by Mrs. Konopka. It bears no disclosure concerning income and reflects unsecured liabilities of only $6,200. Mr. Konopka testified that the Bank told him just to fill something out and that it was not important what he put down. The Debtors then signed a note to the Bank in the amount of $2,736.74 payable one month later. The note was secured by a security agreement on all of the Debtors' household goods. Against the note the Bank then issued a check to the Debtors which they endorsed for deposit to their checking account, thereby clearing the overdraft.

The Debtors had previously borrowed approximately $9,000 from Mr. and Mrs. Hartnett, which was secured by a second mortgage on some rental real property in which the Debtors had an interest. The Debtors defaulted in the payment of their obligations to the Hartnetts and in May 1985, the Hartnetts commenced suit by filing a summons and complaint and serving the same on the Debtors. The Debtors ignored the summons with the result that a default judgment entered against them. The existence of the lawsuit was never disclosed to the Bank. With the default judgment in hand in late June 1985, the Hartnetts sought to execute on the judgment to satisfy the same. Faced with that prospect, the Debtors filed their Chapter 7 proceeding with this Court.

The testimony reflected that this Chapter 7 case was filed on July 1, 1985. On June 24, 1985, Mr. Konopka in fact did begin to have a series of real estate closings and between June 24, 1985, and July 16, 1985, he earned commissions in excess of $13,-000.00, approximately $10,000.00 of which were earned on sales which were closed on July 1, 1985, and after. Had the sales closed without the threat of garnishment from the Hartnetts, Mr. Konopka would, in fact, have had sufficient funds available to pay the Hartnetts' judgment and pay the Bank on the overdraft note.

The Bank has asserted that the genesis of the indebtedness was the February financial statement which was false and on which the Bank relied to its detriment in extending credit to the Debtors. The Debtors argued that the February financial statement was not materially false and was not relied on by the Bank. Further, the Debtors argued that the June note constituted an accord-and-satisfaction, a waiver or satisfaction of the prior debts and that the circumstances surrounding the June financing made that debt fully dischargeable.

The party seeking to have a debt determined to be nondischargeable clearly has the burden of proof. Further, the elements concerning nondischargeability must be

proven by clear and convincing evidence as opposed to the more common burden of a perponderance of the evidence in civil cases. *In re Harms* 53 B.R. 134 (Bkrcty. Minn.1985). *In re Hames* 53 B.R. 868 (Bkrtcy.Minn.1985) *In re Klein* 20 B.R. 119 (Bkrtcy.Penn.1982).

In the instant case dischargeability is premised under 11 USC § 523(a)(2). That section provides that the discharge under the Code does not discharge any debt

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>> (B) use of a statement in writing—
>> (i) that is materially false;
>> (ii) respecting the debtor's or an insider's financial condition;
>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>> (iv) that the debtor caused to be made or published with intent to deceive;....

■ It is this Court's judgment that the February financial statement was in fact materially false. It represented that the Debtors had gross annual income of approximately $80,000.00, as opposed to approximately $19,000.00 in unsecured debts. In fact the Debtors' income on a gross basis was less than one half that and the unsecured indebtedness was in excess of $34,000.00. Further, the Debtors neglected to disclose to the Bank that they were in default on their home mortgage, and the testimony of the banker was that it was an express policy of the Bank that credit would not be extended at a time when a credit applicant was in default on his home mortgage. The Debtors' testimony that he reasonably expected to earn $5,000.00 a month is simply not credible. It is not consistent with either the prior earnings in 1984 nor his earnings in 1985, and certainly was not consistent with the commissions which were being earned by him in the early part of 1985, which totalled $950.00 in January, none in February and $3,600 in March. In fact, after the March commissions, Mr. Konopka did not earn any commissions until late June 1985.

■ The officers of the Bank testified that they reviewed and relied on the Debtors' financial statement. The Bank also obtained a separate credit report which, the Bank officers testified, contained some minor late payments, but on the whole was satisfactory. For purposes of § 523 of the Code, it is not necessary that the Bank rely solely on the false financial statement. The fact that the Bank requested and received an outside credit report does not negate the Bank's reliance on the financial statement. Indeed, had the Bank failed to obtain an outside credit report, in accordance with its normal banking custom, the Court might question whether the Bank's reliance on the financial statements, standing alone, was reasonable. Under the circumstances, the evidence reflects that the Bank did rely on the February financial statement, and it appears to the Court that such reliance was reasonable. *In re Harms, supra.*

■ As to the Debtors' fradulent intent, such intent, if it exists, must be inferred from the circumstances of the case. The testimony established that the financial statement was not filled out at the Bank. Mr. Konopka was able to take it home with him and had the time to fill it out with care. Indeed, the statement itself reflects that it was signed by Mrs. Konopka on February 15, 1985, and Mr. Konopka on February 19, 1985. Thus, Mr. Konopka had the financial statement for five days, including a weekend. The gross inflation of Debtors' combined income, and the oversight of $15,-000.00 of unsecured debt, cannot be excused as casual mistakes. Such representations were either made with the intent that the Bank would rely on them, or with gross disregard for the truth. In any event, it indicates an intent on the part of the Debtors to deceive the Bank for the purpose of inducing the Bank to issue cred-

it to them, which was done. Utilizing the credit extended by the fradulent financial statement, Mr. Konopka then proceeded in June 1985 to cash the twenty-one checks and accumulate the unpaid obligation to the Bank.

The Debtors argue that even if the debt to that time was of a nondischargeable character, the character of the indebtedness was changed when the Bank chose to lend the Debtors $2,295.74 to discharge the overdrafts in the checking account. Thus, they argue that the execution of the promissory note by the Debtors, and the acceptance thereof and advancement of funds by the Bank, constituted a novation or an accord and satisfaction or a waiver by the Bank of the underlying fradulent transaction. While the Bank argues that the June 1985 financial statement was also fradulent, it is clear that, regardless of the fradulent nature of the June 1985 financial statement, the Bank did not rely on that statement in extending the loan, or if it did, such reliance was not reasonable, particularly in light of the fact that the June 1985 financial statement does not even bear a disclosure of the Debtors' income nor was a credit report received or requested.

Under the law in the State of Colorado, refinancing of a debt can have the effect of changing its character. Thus, making a new loan and taking a second note can operate as a waiver of any damages that a lender might have had based on a fraudulent financial statement issued at the time of the original loan. *Berckefeldt v. Hammer* 44 Colo.App. 320, 616 P.2d 183 (1980). Similarly, the defense of accord and satisfaction may be applicable. *Miller v. The Electrical Supply & Construction Company*, 46 Colo. 221, 103 P. 290 (1909); *Whitsett v. Clayton*, 5 Colo. 476 (1880). See also *In re Liming*, 22 B.R. 740 (Bkrtcy. Okla.1982) The question is whether such principles are applicable in a dischargeability case to bar the Court's inquiry into the nature and origin of the underlying debt.

■ While it is the obvious purpose of the Bankruptcy Code to enable financially distressed persons to obtain a fresh start and discharge their former obligations, it is also the policy of the Code, expressed under § 523, that debtors should not be able to shed obligations which were fradulently incurred. Cases which have considered this problem have concluded that the policy of protecting creditors against fraud is overriding and that it is appropriate for the Court to examine the circumstances of the underlying debt unless, at the time of the refinancing, the parties expressly bargain for an extinguishment of any obligation on the earlier transaction. Thus, if a note is given merely as evidence of a prior debt, the Court may look behind the note to the debt to determine if it was incurred by way of a false financial statement or would otherwise be nondischargeable under Code § 523. *In re Kelley*, 259 F.Supp. 297 (U.S. Dist.Ct., N.D., CA, 1965). *In re Garman*, 643 F.2d 1252 (7th Cir., 1980); *In re Russie*, 10 B.R. 832 (Bky.N.D., Ill., 1981). In the *Russie* case the Court stated:

Thus, *Kelley* reaffirms the general rule that when a debtor defrauds a creditor and then gives that creditor a note in the amount of the funds obtained, the court can look at the terms of the note and other extrinsic evidence to determine whether the note was given in satisfaction of the underlying debt or merely as evidence of the underlying debt. A note given as evidence of an underlying nondischargeable debt retains its nondischargeable character. *Ibid* at 835.

Similarly, in the *Liming* case, *supra.*, the Court there observed,

Initially, the debtor submitted a clearly false financial statement which was relied upon by the bank to its detriment and gave rise to this debt. At the time of the renewal and debt reduction the lender while advised of the original deceit, had no choice but to renew and mitigate its loss the best way possible. Under such circumstances the renewed unpaid amount remains nondischargeable. *Supra*, 22 B.R. at 742.

■ In the present case there is nothing to indicate that the note which was taken in June was intended to extinguish the prior

debt. The bank officer testified that the Bank considered it merely a transfer of an overdraft account to a loan account. The debt retained its basic character and the note clearly was only evidence of the debt which had been incurred by the Debtors through the utilization of the false financial statements issued in February 1985. As the Court observed in the *Liming* case, *supra.*, when confronted with the facts in June, and the representations by Mr. Konopka of forthcoming payment by way of expected closings, the Bank, while advised of the original deceit, had little choice but to renew or extend the debt on a short term basis and seek to mitigate its loss the best way possible. Under these circumstances, the renewed unpaid amount remains nondischargeable.

In an effort to prove its case, the Bank took the deposition of Mr. Konopka. Thereafter, it issued interrogatories, requests for admissions, and demands for the production of documents. While the requests for admissions were answered, the interrogatories and requests for production of documents were not, and the Bank filed a motion with the Court for an order to enforce discovery. Such an order was entered, and the Debtors thereafter responded to the discovery request. The Bank has asserted that the responses were grossly inadequate and filed a motion for sanctions including the imposition of attorneys fees.

The Court examined the discovery responses and concluded that there were, in fact, some deficiencies. As a result it was the order of the Court at the hearing that the Debtors would be presumed to have had outstanding, in February 1985, at least the amount of unsecured debt shown on the Debtors' schedules filed in July. The other evidence sought by the Bank appears either to have been obtained or obtainable in the deposition or was not reasonably necessary for the hearing. In fact, considering the amount of the debt at stake, it appears to the Court that the extent of discovery utilized may have been calculated to give comfort to the Bank in the preparation of its case, but was beyond that rea-sonably necessary for the trial of this matter. Thus, no sanctions will be imposed beyond the evidentiary sanctions which were imposed at the hearing.

In accordance with the foregoing,

IT IS THEREFORE ORDERED,

1. That the Debtors' obligations to OmniBank of Aurora are and shall not be discharged by the general order of discharge entered in these proceedings, and

2. OmniBank of Aurora shall have judgment against these Debtors in the aggregate principal amount of $2,736.74 plus interest to the date of hearing of $163.11, and attorneys fees of $435.00, representing 15% of the balance of the note, together with the unpaid balance remaining overdrawn in the checking account of $96.01, together with interest thereon of $16.25 for a total judgment herein of $3,447.11.

LET JUDGMENT BE ENTERED ACCORDINGLY.