**In re Lawrence & Barbara REDER, Debtors.**

**Lawrence OPPENHEIMER, Plaintiff,**

**v.**

**Lawrence & Barbara REDER, Defendants.**

**Bankruptcy No. 4–84–1213.**
**Adv. No. 4–84–126.**

United States Bankruptcy Court, D. Minnesota.

April 1, 1986.

---

530

John M. Giblin, of Smith, Juster, Feikema, Malmon & Haskvitz, Minneapolis, Minn., for plaintiff.

Joseph A. Wentzell, of Blaeser and Johnson, P.A., Minneapolis, Minn., for defendants.

## ORDER

MARGARET A. MAHONEY, Bankruptcy Judge.

The above-entitled matter came on for trial before the undersigned on January 27 and 28, 1986. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334 and § 157 and the Order of Reference of the District Court dated July 27, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

This is an action brought to determine the dischargeability of a debt owed by defendants Lawrence and Barbara Reder to Lawrence Oppenheimer in the amount of $98,977.00. This complaint is based upon 11 U.S.C. § 523(a)(2)(A) and (B) and § 523(a)(4).

Based upon the evidence adduced at the hearing, I am determining that Lawrence and Barbara Reder's debt to Lawrence Oppenheimer are dischargeable in their bankruptcy case.

## FACTS

1. Debtors filed their bankruptcy petition on July 13, 1984, under chapter 7 of title 11 of the United States Code.

2. Defendants Lawrence Reder and Barbara Reder owned a business incorporated under the name of Power Consultant Corporation (PCC). The company was incorporated in November or December of 1981. Power Consultant Corporation had four divisions—Power Supply Company, Power Consultant Sales, Property and Energy Management and Power Consultant Manufacturing. The company held formal Board of Directors meetings.

3. PCC was in the business of providing property management, repair and control functions for property owners. In large part, PCC provided maintenance and repair of the heating and air conditioning systems in buildings. PCC also planned to develop new technology for the types of buildings they managed.

4. Mr. Reder was an industrial engineer. As his expertise in business administration was limited, Lawrence Reder decided PCC needed a business manager.

5. Mr. Oppenheimer had a college degree in economics, and had worked as the manager of a Radio Shack store prior to his employ at PCC.

6. In the summer of 1982, Lawrence Oppenheimer approached Lawrence Reder about the possibility of a job at PCC. He learned of the job through his mother who was a friend of Barbara Reder.

7. Lawrence Oppenheimer had one meeting with Lawrence Reder prior to his commencing employment with PCC. At that time, there was no discussion of Lawrence Oppenheimer loaning money to PCC or investing in the company.

8. Lawrence Oppenheimer commenced employment with the company approximately mid-July or August of 1982.

9. Lawrence Oppenheimer's first month at PCC was spent familiarizing himself with the company. He performed work in the field at the properties managed by PCC. After the first month, he began to perform functions in the office, in particular relating to purchasing.

10. In October 1982, Lawrence Oppenheimer and Lawrence Reder discussed PCC's need for a $35,000 cash infusion. Mr. Reder told Mr. Oppenheimer that the company had a cash flow problem although it had high accounts receivable. It was approximately two months from the initial loan discussion to the time of Lawrence

Oppenheimer's actual loan to PCC of $35,-000.[1]

11. On November 22, 1982, Lawrence Reder, Barbara Reder and Lawrence Oppenheimer entered into a written agreement. Lawrence Oppenheimer agreed to loan $35,000 to PCC. The $35,000 was to be placed in a certificate of deposit at Community State Bank of Bloomington and pledged to the Bank to secure additional credit for PCC. Lawrence Oppenheimer was granted an option for a six-month period to purchase 250 of the 1,000 outstanding shares of common stock of Power Consultant Corporation. The option had an optional six-month extension period. The option price for the stock was $35,000 and the note could be used as the payment for the stock. On the same date, Lawrence and Barbara Reder executed a personal guaranty for the $35,000 loan to Lawrence Oppenheimer.

12. Lawrence Oppenheimer obtained a copy of a financial statement purportedly of Lawrence and Barbara Reder as of September 30, 1982. There was insufficient evidence to establish precisely how or when the financial statement was obtained by Lawrence Oppenheimer.

13. Whenever he obtained the purported financial statement, Lawrence Oppenheimer did not attempt to verify any of the information contained therein. He relied solely on his belief in the Reders' truthfulness in determining the veracity of the financial statement.

14. In making the $35,000 loan, Lawrence Oppenheimer relied on the statements of Lawrence Reder to him about PCC's profitability and the Reders' personal guaranty.

15. Sometime after making the $35,000 loan but prior to November 22, 1982, Lawrence Reder made the statement to Lawrence Oppenheimer that "it was a good time to invest in the company."

16. The financial statement does not contain information that more than one-half of the savings accounts listed on the statement were held in joint tenancy with Lawrence Reder's mother and were, in fact, her money. The financial statement incorrectly states the types and values of the autos of Lawrence and Barbara Reder. The financial statement incorrectly states the values of the Reders' personal property.

17. Lawrence Oppenheimer made additional loans to the company on the following dates and in the following amounts:

| Date | Amount |
| --- | --- |
| January 5, 1982 (sic)[2] | $6,000.00 |
| January 25, 1982 (sic)[2] | $7,000.00 |
| March 22, 1983 | $13,000.00 |
| March 23, 1983 | $27,000.00 |
| March 28, 1983 | $15,000.00 |
| March 31, 1983 | $15,000.00 |
| April 5, 1983 | $3,000.00 |
| May 24, 1983 | $4,000.00 |
| May 27, 1983 | $2,477.00 |
| TOTAL | $92,477.00 |

These loans were made payable to Power Consultant Company, Power Energy Management and Larry Reder. All of the loans were, although made payable to different entities, in actuality loans to Power Consultant Corporation. No written loan documents were executed.

18. Lawrence Oppenheimer made these loans to the company due to cash flow problems of the company.

19. Lawrence Oppenheimer exercised his stock option sometime after November 22, 1982, but prior to January 5, 1983, when he began making other loans to PCC.

20. Lawrence Oppenheimer played an active role in PCC. At various times he was responsible for the purchasing of parts, the collection or attempted collection of several accounts receivable, and the at-

---

**1.** There were three checks totalling $34,900, not $35,000, introduced at the trial but the parties both treated this loan as one for $35,000. The loan documents state that $35,000 was loaned so I am finding that the amount is $35,000.00.

**2.** Although these checks bear dates of January 5 and 25, 1982, they were actually written on January 5 and 25, 1983, according to the testimony of the witnesses.

tempted creation of computer programs for the company's bookkeeping. Moreover, he attempted to obtain financing for the company through a bank or through a public offering. Lawrence Oppenheimer, once he exercised his stock option, if not before, sat in on all board meetings and meetings with the firm's lawyers and consultant. Lawrence Oppenheimer had access to all company documents to which Lawrence Reder had access. Lawrence Oppenheimer had check writing authority at PCC.

21. Lawrence Reder told Lawrence Oppenheimer that the company had a cash flow problem but had high accounts receivable. Lawrence Reder told Lawrence Oppenheimer that he personally guaranteed payment of some of the loans Lawrence Oppenheimer made to PCC[3] and that he would buy Lawrence Oppenheimer's stock if Lawrence Oppenheimer wanted out of the company.

22. PCC repaid the following sums of money on the following dates to Lawrence Oppenheimer:

| Date | Amount |
| --- | --- |
| December 23, 1982 | $1,000.00 |
| January 10, 1983 | $6,000.00 |
| January 10, 1983 | $6,000.00 |
| January 28, 1983 | $7,000.00 |
| March 22, 1983 | $10,000.00 |
| May 24, 1983 | $400.00 |
| TOTAL | $30,400.00 |

23. Barbara Reder worked at PCC approximately one to two days every four to six weeks. Barbara Reder was an equal shareholder with Lawrence Reder in PCC. Barbara Reder was an officer in PCC. Barbara Reder attended several shareholders' meetings at PCC after Lawrence Oppenheimer made the $35,000 loan to PCC. Barbara Reder did not have any discussions with Lawrence Oppenheimer regarding the $35,000 loan or any of the other loans Lawrence Oppenheimer made to PCC.

24. Barbara Reder received a salary from PCC from January 13, 1983 through

April 14, 1983 in the amount of $453.58 per week. Barbara Reder had some knowledge of PCC's activities. She personally guaranteed Lawrence Oppenheimer's $35,000 note.

25. On October 12, 1982, Barbara and Lawrence Reder placed a second mortgage on their homestead for cash for their business.

## DISCUSSION

 Creditor, Lawrence Oppenheimer, seeks to have Debtors' obligations to him found nondischargeable under the provisions of 11 U.S.C. § 523. That section of the U.S. Bankruptcy Code outlines the exceptions to those obligations which are normally dischargeable under the Code. In addressing the claims raised under this section, I initially observe that the underlying purpose of the Bankruptcy Code is to allow debtors a fresh start, with a clean slate. For that reason, exceptions to the dischargeability of debts are to be strictly construed against the creditor in favor of the debtor. *Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915). Thus, the burden of proof in dischargeability cases rests squarely upon the creditor to come forward with clear and convincing evidence supporting every element of the claim. *Nisswa State Bank v. Eberle (In re Eberle),* 61 B.R. 638 (Bktcy.Minn.1985); *IFG Leasing Co. v. Vavra, (In re Harms)* 53 B.R. 134 (Bktcy.Minn.1985); *Barclays American/Business Credit, Inc. v. Long (In re Long),* 44 B.R. 300 (Bktcy. Minn.1983), *aff'd* 774 F.2d 875 (8th Cir. 1985); *Schwartz v. Renville Farmers Co-op Credit Union (In re Schwartz),* 44 B.R. 266 (D.Minn.1984); *Norwest Card Services v. Barnacle (In re Barnacle),* 44 B.R. 50 (Bktcy.Minn.1984); *Associated Dry Goods Company v. Johnson (In re Johnson),* 40 B.R. 756 (Bktcy.Minn.1984); *North Central Wool Marketing Corporation v. Carothers, (In re Carothers),* 22 B.R. 114 (Bktcy.Minn.1982); *Thorpe Credit and*

---

**3.** It was never established exactly which loans to PCC Lawrence Reder verbally personally guaranteed.

*Thrift Company v. Pommerer (In re Pommerer),* 10 B.R. 935 (Bktcy.Minn.1981). Plaintiff raises three claims under § 523, which I shall examine separately. Plaintiff further differentiates the initial $35,000 loan from subsequent loans made by Oppenheimer to the Reders. While the treatment of the two transactions differs slightly, the result is identical. Plaintiff also argues that if the debt is nondischargeable, then Barbara Reder must also be found liable on the basis of her involvement with PCC. I refrain from rendering judgment on this question.[4]

## I.

### *Section 523(a)(2)(A): False Pretenses, False Representations, or Actual Fraud*

Under the provisions of § 523(a)(2)(A): (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) For money, property, services, or an extension, renewal, or refinance of credit, to the extent obtained by—

(A) False pretense, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

To succeed in a nondischargeability claim, the following elements must be proven:

1. The obtaining of money, property, services, or an extension, renewal, or refinancing of credit by a debtor,

2. Using a false representation pertaining to a past or present fact,

3. With knowledge of the representation's falsity, or its assertion as fact with reckless disregard for its truth or falsity,

4. And an intention to deceive the other party or to induce the other party to act upon the representation,

5. Reasonable reliance by the creditor upon the misrepresentation, and

6. Resultant damage to the creditor.

*Thorpe Credit and Thrift Co. v. Pommerer (In re Pommerer), supra; Associated Dry Goods Company v. Johnson (In re Johnson), supra.* I apply these elements first to the initial $35,000 loan, and then to the subsequent loans extended to the Reders by Oppenheimer.

### *A. The Initial Loan*

As to the initial $35,000 loan, there is no doubt in this case that the first element is established.[5] I find, however, that the plaintiff has failed to prove the second requisite element by clear and convincing evidence. Plaintiff in its brief argues almost entirely as to the purported financial statement of the Reders. Section 523(a)(2)(A) requires that money be obtained by "false pretenses, a false representation, or actual fraud" in order for a debt to be found nondischargeable. *Thorpe Credit and Thrift Co. v. Pommerer, (In re Pommerer), supra.* That section, unlike § 523(a)(2)(B) which expressly considers written statements, contemplates representations of a nonwritten nature. Sections 523(a)(2)(A) and 523(a)(2)(B), in this respect, are expressly mutually exclusive. *Barclays American/Business Credit, Inc. (In re Long),* 44 B.R. 300, 302 n. 1 (Bktcy.Minn.1983), *aff'd* 774 F.2d 874 (8th Cir.1985). Federal bankruptcy law as applied in Minnesota, thus removes from the analysis of a section 523(a)(2)(A) complaint, the consideration of evidence pertaining to any written financial statement. I there-

---

**4.** Despite the fact that Barbara Reder worked only sporadically at PCC, her duties and responsibilities being minimal, she was an equal shareholder with her husband in the company. Further, she was an officer of the company and attended several shareholders' meetings at PCC. Finally, she personally guaranteed Oppenheimer's $35,000 note. This is a close issue and I shall reserve judgment on it since the debts have been found to be dischargeable. Nonetheless,

the Eighth Circuit's stance in *Walker v. Citizen's State Bank of Maryville, Missouri (Matter of Walker),* 726 F.2d 452 (8th Cir.1984) would seem to place a debtor like Barbara Reder in a precarious situation.

**5.** All subsequent analysis accepts as fact both the obtaining of money by the debtor, and resultant damage to the creditor.

fore proceed in examining only the nonwritten representations made to Oppenheimer by Lawrence and or Barbara Reder.

In this case, the only nonwritten representation proven by clear and convincing evidence to have been made by the debtor to the creditor was Lawrence Reder's statement that PCC had a cash flow problem, but that it had high accounts receivable. This statement, in my judgment, was not false. Nor does it foster any implication that the status of Reder's business was anything more or less than it actually was at the time he made the statement. There was no evidence produced at trial that the Reders made any fraudulent statements which were, in fact, relied upon by Oppenheimer in making the initial $35,000 loan. Plaintiff's § 523(a)(2)(A) claim fails because of lack of clear and convincing evidence that the statement before the court is a false representation. In this respect, plaintiff fails in both the second and third elements, for not only did Oppenheimer fail to show any falsity of the statement that PCC had a cash flow problem despite high accounts receivable, but he further offered no proof that Reder, when he made the statement, thought that it was false, or that he intended to deceive Oppenheimer by it. The debtor must have knowledge, at the time he makes a representation, of the statement's falsity. *Thorpe Credit and Thrift Co. v. Pommerer, (In re Pommerer), supra.*

■ Plaintiff obliquely suggests that since the Reders had placed a second mortgage upon their homestead in October, 1982, that they had, in effect, used "false pretenses" in failing to disclose this fact prior to obtaining the loan from Oppenheimer. I adopt the longstanding rule of *Davison-Paxon Co. v. Caldwell,* 115 F.2d 189 (5th Cir.1941), *cert. denied* 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941), which held that there must be actual overt false pretense or representation to come within the exception to dischargeability. The *Davison-Paxon* court stated that "not making full disclosure ... is not within the exception [to dischargeability]." *Id.* at 191.

Oppenheimer did not prove that he attempted to solicit or in any way obtain any information as to a second mortgage on the Reders' homestead. I am reluctant to impose a duty on the Reders to supply this information unsolicited because of the difficulty that would result in determining where such "duty to disclose" lines would be drawn in the future. To require a myriad of unbounded, unsolicited disclosures by a debtor can only lead to confusion in the minds of debtors as to the information which they may be required to reveal to a creditor. *Schweig v. Hunter (In re Hunter),* 780 F.2d 1577 (11th Cir.1986).

Since the plaintiff failed to establish elements two and three it is unnecessary that I devote any lengthy discussion to the remaining elements with respect to the initial loan. Nevertheless, the reasonableness of Oppenheimer's reliance will be fully addressed below.

*B. The Subsequent Loans*

I have already ruled that Oppenheimer failed to establish that Lawrence or Barbara Reder knowingly made false representations for the purposes of inducing Oppenheimer to make the first loan. With respect to the subsequent loans, Oppenheimer's section 523(a)(2)(A) claim is similarly fated. At trial, it was adduced that plaintiff made additional loans totalling in excess of $92,000, and that Oppenheimer made these loans due to the cash flow problems of the company. As I have held, any statement that PCC had cash flow problems was not a false representation. Thus, if plaintiff is to prevail in his claim on the subsequent loans he must prove that the debtors subsequently made false representations upon which he reasonably relied. See e.g. *Luttrell v. Scoggins (In re Scoggins),* 52 B.R. 86 (Bktcy.Ala.1985).

■ Aside from the statement made prior to the initial loan, the only other statement that has been proven by clear and convincing evidence to have been made to the plaintiff was Reder's statement after the initial $35,000 loan that "it was a good time to invest in the company." I do not

find that a statement of this nature can rationally be translated into a false representation. It does not purport to be any indication of stability or profitability of the company. It is not a statement of a past or present fact; it is merely Reder's opinion. By its very ambiguity, I find that this statement does not rise to the level of constituting a "false representation." Oppenheimer failed to prove, by even a preponderance of evidence, any further statements that could be construed as false representations made with the intent to induce him into making the subsequent loans.[6] Thus, he has failed, *a fortiori*, to prove the second and third elements of the § 523(a)(2)(A) claim by the higher standard of "clear and convincing" evidence. *Hein v. Emery (In re Emery)*, 52 B.R. 68 (Bktcy. Pa.1985).

■ Further, as previously noted, one of the essential elements of § 523(a)(2)(A) is that the plaintiff reasonably relied on a false representation. *Robles v. Lowther (In re Lowther)*, 32 B.R. 638 (Bktcy.W.D. Okla.1983); *Luft v. Slutzky (Matter of Slutzky)*, 22 B.R. 270 (Bktcy.Mich.1982). While I do not assume the presence of a false representation, I nevertheless focus upon the reasonableness of the plaintiff's reliance upon the statements of Reder. Mr. Oppenheimer is a healthy, educated man with no apparent mental handicap. Prior to his involvement with PCC he had been a manager of a large, retail electronic store. Oppenheimer, however, based upon the very sketchy statements produced at trial, proceeded to make loans in excess of $92,000 to both the Reders personally, and to PCC. He did so without any investigation whatsoever, despite the fact that he had ample opportunity at any point, had he chosen to do so. Oppenheimer had access to all company documents, and also sat in on all board meetings and meetings with the company's lawyers and consultant. He worked on designing computer programs for handling the company's bookkeeping. Despite this ample opportunity to be apprised of the financial status of PCC, Oppenheimer failed to raise any serious question, or conduct any meaningful independent investigation of PCC, prior to extending the subsequent loans. I therefore find his reliance unreasonable under § 523(a)(2)(A). *Robles v. Lowther, (In re Lowther), supra.* To hold otherwise would encourage private lenders to extend credit carelessly and improvidently, under the aegis of section 523(a)(2). This has never been the purpose of the Act. The plaintiff's claim under § 523(a)(2)(A) fails.

## II.

### *Section 523(a)(2)(B): False Financial Statement*

Creditor also attempts to have Debtor's debt to him found nondischargeable under 11 U.S.C. § 523(a)(2)(B). The five elements which must be proven by clear and convincing evidence by a petitioning creditor are succinctly set forth in the statute as follows:

1. The use of a statement in writing;
2. that is materially false;
3. respecting the debtor's or an insider's financial condition;
4. on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and
5. that the debtor caused to be made or published with intent to deceive.

*IFG Leasing Co. v. Vavra (In re Harms)*, 53 B.R. 134, 139 (Bkrtcy.Minn.1985). Again, plaintiff differentiates the initial $35,000 loan from subsequent loans made by Oppenheimer to the Reders.

### *A. The Initial Loan*

The specific language of § 523(a)(2)(B) clearly requires the presence of a state-

---

**6.** There was testimony on both sides as to a possible $35,000,000 contract with the Israeli government. There was also conflicting testimony about PCC's endeavors to secure a large service contract with Comsat. I find that plaintiff failed to prove that any statements that were made with respect to these two contracts constituted false representations or false pretenses on the part of the debtor.

ment in writing. Absent the finding of a written statement, a plaintiff's § 523(a)(2)(B) claim is groundless. *See e.g. Chase Manhattan Bank v. Carpenter (Matter of Carpenter),* 53 B.R. 724, 731 (Bktcy.Ga.1985). In this case, there are serious questions both as to when Oppenheimer came to possess the purported financial statement of the Reders, and whether or not the financial statement was given to Oppenheimer by Lawrence and/or Barbara Reder. Oppenheimer failed to prove by clear and convincing evidence that he came to possess the Reder's purported financial statement prior to making the initial $35,000 loan. I have found that in making the $35,000 loan, Oppenheimer relied, not on any written statement of the Reders' financial status, but on the statements made to him by Reder about PCC's profitability and the Reders' personal guaranty. Thus, as to the initial loan, plaintiff's claim fails for want of a statement in writing.

### B. The Subsequent Loans

 Oppenheimer did, at some point, obtain the Reders' purported financial statement. I find that it is "materially false" as a statement of the Reders' financial worth. The financial statement of the Reders as of September 30, 1982 does not contain information that more than one-half of the savings accounts listed on the statement were held in joint tenancy with Reder's mother and were, in fact, her money. The financial statement incorrectly states the types and values of the Reders' automobiles. The financial statement incorrectly states the value of the Reders' personal property. Thus, it is a "materially false" statement "respecting the debtors' financial condition" in that it "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *Eberle v. Nisswa State Bank (In re Eberle), supra; Norwest Card Services v. Barnacle (In re Barnacle), supra; Merchants National Bank v. Denenberg (In re Denenberg),* 37 B.R. 267, 271 (Bktcy.Mass.1983).

A plaintiff's claim, however, must do more than satisfy the first three elements of the statute. All of the elements must be proven by clear and convincing evidence. *IFG Leasing Co. v. Vavra (In re Harms), supra,* at 140. In proving the fourth element the creditor must show that he both actually and reasonably relied upon the false financial statement in making loans to the debtor. *IFG Leasing Co., supra.* Oppenheimer testified at the trial that he relied upon the false financial statement in making loans to PCC. Passing on the determination of whether or not he proved actual reliance by clear and convincing evidence, I examine the reasonableness of such reliance under the circumstances.

As recognized in *IFG Leasing Co., supra,* the emerging standard of reasonableness in reliance upon a false financial statement requires me to measure the creditor's actual conduct against three different factors: the creditor's standard practices in evaluating credit-worthiness; the standards or customs of the creditor's industry in evaluating credit-worthiness; and the surrounding circumstances existing at the time of the debtor's application for credit. *Id.* at 141. As plaintiff is neither a professional lender nor a financial institution, the first two factors are somewhat difficult to apply. Nevertheless, the third factor provides a sufficient standard by which the reasonableness of Oppenheimer's reliance may be measured.

At the time he began issuing the subsequent loans to PCC, Oppenheimer had been in its employ for approximately five months. During that time he had played an active role in PCC. He had acted as a purchaser for the company; he had been engaged in the collection of several accounts; he was aware that the PCC had no corporate books, as he had worked on computer programs for the company's bookkeeping function; and, he had attempted to obtain financing for PCC through a bank or through a public offering. Further, on the knowledge available to him through these functions, the record shows that Oppenheimer exercised his stock option prior

to making the subsequent loans to the company. Once he had exercised his stock option, he sat in on all board meetings and meetings with the firm's lawyers and consultant. Finally, he not only had check writing authority at PCC, but he also had access to all company documents to which Reder had access. In short, Oppenheimer was in at the very ground level of PCC and had every opportunity to investigate and verify it and the Reders' financial condition.

As noted above, Oppenheimer is an educated, experienced businessman. Nonetheless, amidst surrounding circumstances which saw Reder continually asking for substantial cash infusions, and despite the fact that he had full opportunity to do so, Oppenheimer failed to conduct even the slightest independent investigation as to why the Reders or the company were in continual need of capital. The mere existence of such a continuing, unmet financial need was, in light of the surrounding circumstances, the "red flag" which should have put Oppenheimer on notice that the financial statement might be false. *IFG Leasing Co. v. Vavra, supra.* Moreover, the fact that Oppenheimer's mother and Barbara Reder were on friendly terms does not relieve Oppenheimer of the duty to use prudence and good judgment in conducting his financial affairs. The "pure heart and empty head" approach to lending does not satisfy the requirement of reasonable reliance of § 523(a)(2). *Green River Production Credit Association v. Bridges (In re Bridges)*, 51 B.R. 85 (Bktcy.W.D.Ky.1985). Section 523(a)(2)(B) requires a creditor to make at least a modicum of independent verification of a debtor's financial statement as a prerequisite to bringing a successful nondischargeability complaint. *IFG Leasing Co. v. Vavra (In re Harms)*, *supra*; *Green River Production Credit Association v. Bridges (In re Bridges)*, *supra*; *First National Bank, Dayton Ohio v. Breen (In re Breen)*, 13 B.R. 965 (Bktcy.Ohio 1981). Such an investigation is especially warranted under circumstances such as are present here. If a creditor fails to even minimally investigate the information contained in a debtor's financial statement, such a failure will be prima facie evidence that the creditor's reliance on that financial statement was unreasonable. *In re Bridges, supra.* Plaintiff has failed to show that his reliance upon the financial statement was reasonable.

■ Though I do not need to get to the issue of intent, I shall address it with a few short observations. The specific language of § 523(a)(2)(B)(iii) unambiguously limits the exception's application to instances where a false financial statement was submitted to the petitioning creditor. In this case, the petitioning creditor has failed to show, by clear and convincing evidence, that the financial statement was given to Oppenheimer by either Lawrence or Barbara Reder. The testimony as to this fact was conflicting, and in hearing the testimony, I find the debtor to be more credible than the plaintiff. The role of the Bankruptcy Court as the finder of fact is to resolve conflicts of fact resulting from oral testimony by making a credibility determination. *Valley National Bank v. Bush (In re Bush )*, 696 F.2d 640 (8th Cir.1983). There was no evidence produced which proved, by the clear and convincing standard, that Oppenheimer didn't merely remove the financial statement from one of Reder's desk drawers. I am reluctant, in this case, to make a finding of "desk drawer intent" attributable to the debtors.

### III.

*Section 523(a)(4): Fraud or Defalcation While Acting in a Fiduciary Capacity*

Creditor's final claim is that the debtors' obtaining of funds from him constitutes defalcation or fraud by a fiduciary. The threshhold issue in determining a claim under § 523(a)(4) is to determine the existence of a fiduciary capacity.

■ I find that in this case no fiduciary relationship exists. It has long been recognized that under this section of the Code a fiduciary capacity arises only where an "express formal trust" exists. *Davis v.*

*Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934). At no point was there an express formal trust between Oppenheimer and the Reders. Further, the evidence shows that the Reders had, in fact, made several attempts to repay the loans. Such activity is at the very heart of the creditor/debtor relationship and does not create a fiduciary relationship within the meaning of the Code. *Barclays American Business Credit, Inc. v. Long (In re Long), supra, aff'd* 774 F.2d 875 (8th Cir.1985). The term "fiduciary" is very limited under the Code, and I will not extend its definition to the point which plaintiff requests, in order to entertain further discussion.

Absent the existence of a fiduciary relationship, no analysis of fraud or defalcation under § 523(a)(4) need be made.

### CONCLUSION

1. The elements of § 523(a)(2)(A) were not established here. No false representations were proven in either the initial loan or the subsequent transactions. Moreover, knowledge of falsity of the representations was not shown in any of the statements made by the debtors. Therefore, the debt is not barred from discharge by § 523(a)(2)(A).

2. The elements of § 523(a)(2)(B) were also not established. Oppenheimer failed to prove, by the clear and convincing standard, that he was given the Reders' financial statement prior to the initial loan. Further, given the surrounding circumstances, Oppenheimer's reliance upon the financial statement, without any attempt at independent verification, was unreasonable. Even assuming reasonable reliance, Oppenheimer failed to prove that he received the financial statement from Lawrence or Barbara Reder. Therefore, the debt is not barred from discharge by § 523(a)(2)(B).

3. The elements of § 523(a)(4) were not established. No fiduciary capacity or express trust arrangement was shown in this case. Therefore the debt is not barred from discharge by § 523(a)(4).

THEREFORE, IT IS ORDERED that the above-mentioned debts of Lawrence and Barbara Reder to Lawrence Oppenheimer are dischargeable under 11 U.S.C. § 727.