In re Gerald G. LIPPERT, Debtor.

FRANKLIN STATE BANK, a Minnesota banking corporation, Plaintiff,

v.

Gerald G. LIPPERT, Defendant.

and

Victor S. SATHER, Plaintiff,

v.

Gerald G. LIPPERT, Defendant.

Bankruptcy No. 4–86–1754.
Adv. Nos. 4–86–237, 4–86–238.

United States Bankruptcy Court,
D. Minnesota.

April 12, 1988.

Joseph Wentzel, Minneapolis, Minn., for debtor.

James L. Wahlfors, Minneapolis, Minn., for Franklin State Bank & Victor S. Sather.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

NANCY C. DREHER, Bankruptcy Judge.

These adversary proceedings came on for trial before the undersigned on February 29, 1988. James Wahlfors appeared for the plaintiffs, Franklin State Bank ("Franklin Bank" or "the bank") and Victor S. Sather ("Sather"), and Joseph Wentzel appeared for the defendant, Gerald Lippert ("Lippert"). Plaintiffs seek to have the court declare Gerald Lippert's debts to them to be nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(B) and 523(a)(6). This court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 103(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Based on the evidence, and all the files, records and proceedings herein, I find and conclude as follows:

### FACTS

Lippert is a Renville County farmer and is the debtor in this chapter 7 case. After completing the 8th grade, he began work on the family farm and he has been a farmer since. In the 1950's he married and thereafter raised a family of five with his first wife. That marriage ended in a separation and dissolution which was amicable and which was concluded in 1977. In connection with the dissolution proceedings, Lippert and his first wife transferred all their ownership interest in the 400 acre family farm (which the Lipperts were purchasing from Lippert's family estate) to their five children. Gerald Lippert retained a life estate for himself.

Lippert remarried shortly thereafter. Since 1984, Lippert has not actually farmed the property. Rather, he has rented it (and at times his equipment) to a tenant farmer and has worked part time on the farm for that tenant.

Franklin Bank is a small rural farm town bank. Its President, Sather, has worked for the bank since the 1930's. He is 79 years old. Franklin Bank employs six people and Sather serves as its loan officer.

Lippert was a customer of Franklin Bank from at least the early 1970's. While early bank records were not available, it appears that he was personally indebted to the bank for funds used in his farming operations in a substantial sum by the late 1970's. As security for advances, the bank held a security interest in farming equipment, machinery and vehicles, but did not take any mortgage or other security interest in Lippert's real property. Lippert signed several Farm Security Agreements during the 1970's and early 1980's. The last one, upon which Franklin Bank relies in this case, was dated February 4, 1982. Attached thereto were depreciation schedules from

Lippert's 1981 tax return which listed the secured personalty as including literally all of Lippert's farm machinery, equipment, and a number of vehicles. The Farm Security Agreement specifically provided that Lippert would not sell the collateral, or any portion of it, without the bank's permission and that proceeds of sales belonged to the bank.

On November 18, 1982, the bank renewed Lippert's loan and Lippert signed a renewal promissory note in the principal sum of $57,100.00, at a 15% annual interest rate. At the same time, the bank also advanced an additional $14,500.00 to Lippert and Lippert signed a new promissory note, also bearing interest at 15% per annum. Unbeknownst to Lippert, this second note was sold to Sather (whether contemporaneously or later is unclear). Franklin Bank thereafter made three additional advances to Lippert, each in the sum of $1,500.00, on February 7, 1983; April 3, 1983; and April 25, 1983 respectively, and, Lippert signed three additional promissory notes bearing interest at 13½% per annum. Again, and finally, on April 16, 1984, the bank made two separate advances to Lippert, one in the amount of $6,600.00 and one in the amount of $11,900.00. Two promissory notes signed by Lippert reflect these transactions, each bearing interest at 14% per annum. Sather purchased the smaller of these two new notes. The larger of the two listed Lippert's "reserve corn" as security. All notes were due on demand and called for semi-annual interest payments. Sather testified that the last note was sold to him because Lippert had by this time reached Franklin Bank's lending limits. Lippert timely paid semi-annual interest payments through July 1984 on all notes except the two which had been purchased by Sather, on which no interest was ever paid.

According to Sather, over the years Franklin Bank requested and Lippert supplied it with several personal financial statements. The only statements remaining in the bank's file as of the time of this trial were two, one bearing date May 3, 1983, and the second bearing date May 31, 1985. Each purports to relate solely to the financial condition of Gerald Lippert.

At trial, Sather testified that the bank and Sather relied on Lippert's financial statements, including those dated May 3, 1983 and May 30, 1985, both in advancing additional sums to Lippert and in failing to call the notes due. The statements reflected a net worth of $214,500.00 in 1983 and $248,000.00 in 1985, respectively. Both reflect that Lippert's only three assets of significance were (a) the 400 acre family farm in Renville County, valued in both statements at $400,000.00; (b) farm machinery and equipment, valued at $140,000.00 in 1983 and $70,000.00 in 1985; and, (c) a home in Arizona, valued at approximately $31,000.00 on both statements. Both statements also reflect that Lippert's principal liabilities were (a) his indebtedness to the Franklin Bank of $62,100.00 in 1983 and $73,500.00 in 1985 (and to the Morton State Bank, which had taken over the additional $35,000.00 of the Lippert indebtedness to the Franklin Bank); and (b) Lippert's indebtedness to the Lippert estate for the purchase of the family farm, in the sum of $202,000.00 in 1983 and reduced to $176,000.00 by 1985.

The bank and Sather assert the financial statements are materially false and misleading in the following three principal respects:

(1) In failing to schedule a $50,000.00 indebtedness Lippert owed his daughter as a result of an advance she made to her father sometime in early 1982.

(2) In listing 400 acres of farm land in Renville county valued at $400,000.00 when, in fact, as a result of the 1977 dissolution proceedings, Lippert's sole interest in the property was a life estate.

(3) In listing property in Arizona valued at approximately $31,000.00, when, in fact, the property was owned solely by Lippert's second wife.

The differences in assets and liabilities, if correctly stated, would have reflected a negative net worth rather than a substantially positive net worth.

The two financial statements in issue were prepared in a very casual manner.

This was so, even though at some point in time, Lippert became Franklin Bank's largest outstanding loan debtor. The procedure the parties followed in preparation of the financial statements was as follows. Sather and Lippert would meet very briefly in Sather's office and, with Sather using the immediate predecessor as a guide, the two would go over additions, corrections and other changes. Lippert testified that he usually signed the new statement in blank and let Sather type in the details, based on information discussed at the meeting. Sometimes Sather would retype the new statement while Lippert waited; sometimes not. Lippert would, he said, answer all of Sather's questions, and Sather did not deny this. Sather's testimony was not to the effect that Lippert actually made misrepresentations of his condition with respect to the properties and indebtedness or gave false answers to his questions; rather, Sather complains now that Lippert simply failed to volunteer that he did not own a fee in the Renville County property, did not actually own the land in Arizona, and did not advise Sather regarding the loan to his daughter. Lippert testified that their discussions sometimes lasted "two minutes" and that usually he was in the bank for a total of less than ten minutes. He also testified that he relied on Sather to ask the questions he wanted answered, and often Lippert did not even see the statements before they were signed and given to Sather.

There is some dispute in the testimony regarding when the bank first learned about these three contested matters. Lippert testified that he informed Sather about the life estate interest in the Renville County property long before 1983. Sather contradicted Lippert in this regard, saying he first learned of the life estate situation in 1985. Over the years Franklin Bank and Sather encouraged Lippert to seek alternative sources of financing and repeatedly discussed the extensive nature of Lippert's loans. By 1985, with interest payments in default and the farm economy eroding,

Sather testified the bank decided that it wanted a mortgage on the Renville County farm. It was then, Sather testified, that Franklin Bank learned the full details regarding Lippert's life estate. According to Sather (and Lippert agrees), in May of 1985, when Lippert and Sather met to discuss the May 1985 financial statement, Sather asked Lippert if he would give the bank a mortgage on the Renville farm. Lippert then advised (or, according to Lippert, reminded) Sather of his limited life estate, but also assured him that there probably would be no difficulty because his children would likely agree to the granting of a mortgage to the bank. As it turned out, the children refused to mortgage their property and the bank at that point obtained an updated abstract which clearly showed the deed of transfer of the property to the children.[1]

There is also a dispute over when the bank first learned of the facts relating to the remaining two deficiencies in the statements. Lippert asserted that he told Sather before 1983 that his second wife controlled the Arizona land and that the loan from his daughter was obtained at Sather's suggestion, and that Sather was told at the time that Lippert would be approaching his daughter for help. According to Sather, he knew of neither of these two facts until after the bankruptcy filing.

It is undisputed that the bank took no steps to call the promissory notes. Franklin Bank also did not require an updated financial statement from Lippert, or anything to protect its interests, in the summer of 1985 when it concedes it learned of the true facts relating to the farm.

Sometime in early 1986, the Morton State Bank (also referred to as the Bank of Redwood) became concerned about its $35,-000.00 in "laid off" loans to Lippert. After first threatening to sue Franklin Bank, it secured Franklin Bank's release of any security interest in Lippert's farm machinery and equipment and then foreclosed on the security. Apparently, Morton State Bank

1. Lippert testified that the bank had the abstract on the property well in advance of their May 1985 meeting.

was made whole when it foreclosed on some of Lippert's equipment and machinery. But, shortly thereafter, Lippert filed this Chapter 7 case.

The bank not only complains of deficiencies in the financial statements, it also asserts that Lippert wrongfully sold a substantial amount of equipment which was listed in the depreciation schedules attached to the 1982 Farm Security Agreement. It is undisputed that Lippert did engage in the following pattern of sales of property listed in that schedule:

| Identification | Sales Price | Date |
|---|---|---|
| Field cultivator | $ 700.00 | 8/84 |
| J.D. swather | $ 1,700.00 | 6/84 |
| J.D. planter | $ 9,952.00 | 4/85 |
| Sprayer | $ 545.00 | 12/85 |
| J.D. drill | $ 3,413.00 | 4/85 |
| 1979 Chevy Truck | $13,294.00 | 6/85 |
| J.D. disc | $ 758.00 | 9/85 |
| Stalk chopper | $ 1,422.00 | 9/85 |
| 1965 Chevy Truck | $ 2,996.00 | 9/85 |
| Westgo grain auger | $ 475.00 | 11/85[2] |

The bank complains that all of these sales were unauthorized and that Lippert's actions in selling them without paying it the proceeds were wrongful.

Lippert, however, testified that he understood the bank's security interest extended mainly to his three or four larger pieces of equipment, including his combine and tractors. According to Lippert, he gave Sather the depreciation schedules for a wholly separate purpose and he never knew until this litigation that the lists had been appended to the security agreement by Sather. Moreover, Lippert advised Sather repeatedly that, because he had essentially ceased this type of farming, he would be cutting back and selling some equipment, expecting at some time in the near future to go into ridge tilling which would require entirely different types of equipment. Lippert testified that he never knew the bank had a right to prevent sales of items other than his largest pieces of equipment (which he still owns today) and a few pieces of other equipment, the sale proceeds of which he apparently did pay to the Bank.

Whatever the understandings, it seems clear that much of the equipment was covered by prior security interests and there was little equity in it to benefit the bank. For example, the swather, planter, J.D. disc, and one of the Chevy trucks were all secured by prior purchase money security interests which were paid off, leaving in general "very little equity." While Lippert appears to have owned the field cultivator, sprayer, disc, stalk chopper, second Chevy truck, and auger free and clear of liens, their sale price totalled only $6,651.00. Furthermore, the bank made no inspections or inventories of the property on which it claimed a security agreement at the time of the 1982 Farm Security Agreement or thereafter. There was no evidence in the record regarding whether the bank knew of the prior purchase money security interests or had performed any UCC filing checks relating thereto.

## DISCUSSION

Franklin Bank and Sather initiated these adversary proceedings seeking judgment of nondischargeability of the debts owing them from Lippert under 11 U.S.C. §§ 523(a)(2)(B) and 523(a)(6). Section 523 provides in pertinent part:

(a) a discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

\* \* \* \* \* \*

---

**2.** The bank also complains with respect to the sale of a Glenco soil saver, sold for $2,400.00 in June 1984. But, this piece of equipment was not listed in the depreciation schedules and was not even purchased until August of 1982, after the Farm Security Agreement was signed.

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

\* \* \* \* \* \*

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

\* \* \* \* \* \*

11 U.S.C. § 523(a)(2)(B), (6).

### A. False Financial Statements

Nondischargeable fraud under section 523(a)(2)(B) involves active and intentional wrongdoing by misrepresentation and deceit. It is an intentional tort and must be proven by clear and convincing evidence. *F & M Marquette Nat'l Bank v. Richards (In re Richards)*, 71 B.R. 1017, 1021 (Bktcy.D.Minn.1987). Congress specifically required that nondischargeability under section 523(a)(2)(B) be premised upon a showing of reasonable reliance because creditors might induce debtors to falsify financial statements in order to make a debt nondischargeable. *Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340, 343 (8th Cir.1987).

This court does not dispute the fact that there was a financial statement in writing which contained materially false statements respecting Lippert's financial condition. The inquiry, however, does not stop here because plaintiffs must prove *all* elements by clear and convincing evidence. *See Oppenheimer v. Reder (In re Reder)*, 60 B.R. 529, 537 (Bktcy.D.Minn.1986). Therefore, plaintiffs must prove they both actually and reasonably relied upon the false financial statements in making the loans to Lippert, in light of the fact that Sather executed the financial statements with Lippert merely supplying information requested by Sather.

Reasonableness is a measure against which circumstantial evidence that tends to prove or disprove reliance is to be compared, and it should be viewed as a test of credibility. *Richards*, 71 B.R. at 1022. Furthermore, despite allegations and testimony of reliance, there can be none where the recipient knows of the falsehood, receives information that on its face is insufficient to provide a basis for reliance or where an investigation has been conducted that suggests falsehood. *Id.* The existence of such facts contradicts the very characteristic of reliance. According to *Richards*, Congress did not intend to make dischargeable a dishonest debt simply because the victim of fraud might have been negligent in the transaction. 71 B.R. at 1022.

■ Franklin Bank has simply failed to establish, by the requisite standard of proof, that it relied on the financial statements, rather than on Lippert's cash flow and its own security interest in Lippert's farm machinery, equipment and vehicles, and, that, if it relied, such reliance was reasonable. The relationship between the parties, as well as the statements themselves, gave the bank fair warning of the true facts. The financial statements are filled with "red flags" which belie a claim of reasonable reliance. *See Reder*, 60 B.R. at 538 ("red flags" should place person on notice that financial statement might be false). Although *Richards* rejects the notion that a creditor must make an independent investigation of the debtor's financial statement as a prerequisite to a successful complaint under section 523(a)(2)(B), it does recognize a facially insufficient financial statement, which does not contain sufficient information to present the true financial condition of the debtor, would not by itself support a claim of reasonable reliance. *See* 71 B.R. at 1021–22. For example, the back page of each of the financial statements contains specific questions, such as "In whose name is the title to the above real estate held?" and "Is real estate held in fee simple, leasehold or under contract?". These questions were at all times left blank. Either Sather knew of the true

facts or did not believe answers to the questions were important enough to ask.

This was not a situation where Lippert should take the blame for failing to fill in the answers; the preparation of these financial statements was clearly a joint effort in which Lippert relied on Sather as much as Sather may have relied on Lippert. Cases which have dealt with situations where there was a joint effort by debtor and creditor to produce the financial statement have held that, where the debtor merely signed the statement in blank or failed to read it, the debtor acted with reckless disregard to the accuracy of the information, with the claim against the debtor deemed nondischargeable. *See, e.g., Archer v. Massey–Ferguson Credit Corp. (In re Archer)*, 55 B.R. 174, 179 (Bktcy.M. D.Ga.1985); *In re Coughlin*, 27 B.R. 632, 636 (Bktcy. 1st Cir.1983). That type of situation is not present here because Lippert, relying on Sather, volunteered financial information on request which Sather thought was necessary in determining whether to loan money to Lippert.

Testimony also reflected plaintiffs had some knowledge that Lippert was in financial difficulty. For example, the Arizona property is reflected as an asset with no offsetting liability, yet Sather knew that Lippert was in financial difficulties early on. Moreover, the financial statement reflects only three assets of major significance: the Renville farm, the Arizona property, and Lippert's equipment, machinery and vehicles. This fact should have prompted a reasonable creditor to ask a considerable number of questions relating to the true nature of the debtor's ownership interests in those assets. *See Village Bank & Trust Co. of Richfield v. Futterman (In re Futterman)*, 35 B.R. 102, 104– 05 (Bktcy.D.Conn.1983) (reliance on debtor's financial statement not reasonable where bank had knowledge statement was incomplete and inaccurate).

Moreover, testimony at trial established the financial statements were treated so cavalierly that neither Sather nor Lippert obtained or cared to obtain actual and correct information relating to Lippert's "cash in bank" or to Lippert's liabilities as reflected in its commitments to the Franklin State Bank itself. There were also many other admitted sloppy errors in how the information was filled out. Lippert was one of the bank's largest debtors; such a position should have called for special care, rather than two minute conversations on a sporadic basis over several years. Plaintiffs, armed with knowledge that Lippert's financial statement was defective in various respects, should have attempted to verify the financial information in order to justify its decision to loan additional sums. *Futterman*, 35 B.R. at 105. Based on the foregoing, I find that the Bank simply failed to act reasonably if it did, in fact, rely to any extent on the financial statements in its continued dealings with Gerald Lippert.

■ In addition, except as to the April 1984, advances, Franklin Bank is left to contend that it relied by forbearing from collection, since all other advances were made before the bank had the 1983 statement and no action was taken in connection with receipt of the 1985 statement, and that its forbearance from exercising its legal remedies is somehow a sufficient showing of detrimental reliance to obtain a judgment of nondischargeability. However, as stated in *Richards*, forbearance may be sufficient to establish actionable fraud, but it does not follow that the forbearing party will be entitled to judgment of nondischargeability of the entire debt. 71 B.R. at 1023. Forbearance where action would have been meaningless does not result in a circumstance sufficient to render a debt nondischargeable. *Id.* Because Lippert's actual equity reflected a negative net worth any remedial action by Franklin Bank would have been meaningless and that in itself will not entitle Franklin Bank to a judgment of nondischargeability.

■ Lastly, plaintiffs must prove Lippert caused the financial statement to be made or published with the intent to deceive. It must show that the debtor's alleged false statement in writing was either knowingly false or made so recklessly as to warrant a finding that he acted fraudulent-

ly. *Archer*, 55 B.R. at 179. Furthermore, intent to deceive is present when the debtor has seen the financial statement and the errors were such that he knew or should have known of their falsity. *Coughlin*, 27 B.R. at 636; *Modern Distributors, Inc. v. Gray (In re Gray)*, 22 B.R. 676, 680–81 (Bktcy.D.Wis.1982). In *Archer* the defendant signed financial statements in blank allowing the information to be filled in without his knowledge, which the court concluded amounted to a reckless indifference and disregard for the accuracy of the information which amounted to an intent to deceive within the Code. 55 B.R. at 179–80. The case at hand is distinguishable because Lippert supplied the necessary information Sather requested, although Lippert did at times sign the financial statement in blank prior to conversations with Sather. Plaintiffs, however, have made no showing of proof that Lippert intended to deceive Franklin Bank by his actions. Lippert volunteered financial information upon request which he honestly felt was true. For example, as stated previously, plaintiffs argued Lippert intended to deceive the bank because Lippert failed to disclose the fact that he did not have an ownership interest in the Arizona property. Lippert's testimony, however, reflects that he did not understand the legal ramifications of the type of ownership interest in the Arizona property and furthermore that if there was any misrepresentation it was inadvertent and not intentional. *See Barnett Bank of South Florida N.A. v. Gilman (In re Gilman)*, 31 B.R. 927, 929 (Bktcy.S.D.Fla. 1983).

### B. *Willful and Malicious Injury*

Plaintiffs also argue Lippert should be excepted from discharge under 11 U.S. C. § 523(a)(6) because Lippert intentionally caused willful and malicious injury. To establish nondischargeability under this section the creditor must establish that the debtor inflicted injury upon him while acting with a state of mind both willful and malicious. *Western Petroleum Co. v. Burgstaler*, 58 B.R. 508, 515 (Bkrtcy.Mn. 1986). Willful means the debtor acted intentionally in bringing about the injury and not negligently or accidently. *Id.* Furthermore, the Eighth Circuit has stated that a heightened level of culpability must be found to merit a finding of malice. *In re Long*, 774 F.2d 875, 881 (8th Cir.1985). According to *Long*, dischargeability under section 523(a)(6) turns on whether the conduct is (1) headstrong and knowing (willful) and, (2) targeted at the creditor (malicious). 774 F.2d at 881.

Plaintiffs' argument fails because it simply has not proven either element of the *Long* test. It has already been shown Lippert did not intentionally deceive plaintiffs and furthermore there has been no proof of malice which rises to the level of culpability contemplated by *Long*.

### ORDER

Based on the foregoing, IT IS HEREBY ORDERED:

The debts of Gerald Lippert to Franklin State Bank and Victor S. Sather are discharged under 11 U.S.C. § 727 and are not excepted from discharge under either 11 U.S.C. §§ 523(a)(2)(B) or 523(a)(6).

LET JUDGMENT BE ENTERED ACCORDINGLY.